**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

STEVEN DAVID VOGT,                )
                                  )        Civil Action No. 08 – 530
                    Petitioner,   )
                                  )        Magistrate Judge Lisa Pupo Lenihan
          v.                      )
                                  )
SUPERINTENDENT COLEMAN,           )        ECF Nos. 56, 57, 76, 77 & 81
                                  )
                    Respondent.   )

**MEMORANDUM OPINION**

This case is before the Court on a Motion for Relief from Judgment filed by Petitioner,

Steven David Vogt ("Vogt"), pursuant to Federal Rule of Civil Procedure 60(b) ("Rule 60(b)").

(ECF Nos. 56, 57).  This is the sixth Rule 60(b) motion (ECF Nos. 31, 37, 40, 42, 49) Vogt has

filed since his Petition for Writ of Habeas Corpus ("Petition") was dismissed as untimely on

January 8, 2010, (ECF No. 24).  In this motion he argues that he is entitled to relief based on

Bracey v. Superintendent Rockview SCI, 986 F.3d 274 (3d Cir. 2021) and Dennis v. Secretary,

Pennsylvania Department of Corrections, 834 F.3d 263 (3d Cir. 2016).  Specifically, he argues

that this Court should vacate its previous Order dismissing his Petition as untimely because,

based on these recent cases, this Court was incorrect when it relied on his lack of diligence in

discovering the factual predicate for his habeas claims related to the identity of the individual

who accompanied his co-defendant, Walter Cowfer, into the residence of Carrie Deiseroth and

Leonard Mayhugh on the morning following the murder of Francis Landry when Cowfer

confessed to his participation in the crime.  For the following reasons, his Rule 60(b) motion will

be denied.  His related Motion for an Evidentiary Hearing (ECF No. 76), Motion to Appoint

1

Counsel (ECF No. 77) and Motion for Corrective Instruction and Sanctions (ECF No. 81) will also be denied.

I.    **Relevant State Court Factual and Procedural History**

On May 12, 1990, Francis Landry ("Landry") picked up Michael Sopo ("Sopo"), Margaret Zawodniak[1] ("Zawodniak") and Steven Vogt ("Vogt") in his blue Nissan and took them to his residence in Export, Pennsylvania where, except for Landry, they drank beer. A while later, Walter Cowfer ("Cowfer") came to Landry's residence. Vogt, Cowfer, Sopo and Zawodniak then left and went to Arthur McClearn's[2] ("McClearn") apartment where they continued to drink and discussed a plan to murder Landry. The parties returned to Landry's residence where they resumed drinking beer. At some point, Cowfer went to Landry's car where Landry was sleeping and asked to take the car to Cupec's Lake. He then ordered Landry to get in the back seat where he was surrounded by two of the others. Once there, Landry was ordered out of the car by Cowfer, Vogt, and McClearn. Zawodniak and Sopo stayed in the car while the others started walking down the path to the lake. Landry complained that his chest hurt and protested going any further. Landry was eventually pushed over a hill where he fell 30 to 40 feet into the lake. The others threw rocks into the water and rolled a huge boulder into the water that hit Landry. They then went back to the car, drank some more beer and left the area. The next day, Landry's drowned body was discovered by some area scuba divers. Several days later, State Trooper Strawbridge received a call from the Monroe County Sheriff's Department in Tavernier, Florida that Sopo, Vogt and Cowfer were in custody there and in possession of the registration plate of Landry's car and his wallet. *See* Commonwealth v. Vogt, No. 1281 PGH

---

[1] Zawodniak passed away on March 8, 2020.
[2] McClearn passed away on January 14, 2017.

1991, unpublished memorandum at 2-3 (Pa. Super. Ct. Oct. 21, 1992); *see also* ECF No. 14-4, pp.35-36.

Subsequently, Vogt, Cowfer, Zawodniak, Sopo and McClearn were arrested and charged with Landry's murder.  Vogt, Cowfer and Zawodniak elected to proceed to a trial by jury.  Sopo and McClearn entered guilty pleas whereby they admitted their involvement in the murder.  For his part, McClearn pled guilty to third degree murder, robbery, theft by unlawful taking, kidnapping and criminal conspiracy, and in exchange, received a sentence of four to eight years of imprisonment. Sopo pled guilty to criminal conspiracy.  Both men testified on behalf of the Commonwealth at the trial of Vogt, Cowfer and Zawodniak, which commenced before a jury on January 29, 1991.  At the conclusion of the trial, Cowfer and Vogt were convicted of first-degree murder, robbery, theft by unlawful taking, kidnapping and criminal conspiracy.  Zawodniak was acquitted of all charges.  Following the denial of post-verdict motions, on June 17, 1991, Vogt was sentenced to life imprisonment for the murder conviction.

As noted above, Sopo testified on behalf of the Commonwealth at trial.  He was 18 years old at the time of Landry's murder.  (ECF No. 72-1, p.86.)  He testified about the events leading up to the trip to Cupec's Lake.  When asked what he recalled after the group got into Landry's car to go to that location, he replied that he remembered finishing up his beer and waking up in the car.  Id., p.98.  He testified that after he awoke, Cowfer was driving and when Sopo asked about the whereabouts of Landry, he was told that Landry was swimming.  Id., p.99.  He testified that after that statement was made, the group when to Export.  Id.  At that point, "Mrs. Zawodniak got out of the vehicle.  Mr. McClearn gathered some things up and we left."  Id., p.100.  There was no mention of a stop at the residence of Carrie Deiseroth ("Deiseroth") and Leonard Mayhugh ("Mayhugh").  He then detailed the group's travel to other states and the

3

cashing of Landry's checks.  Id., pp.100-03.  On cross-examination, the following exchange

occurred:

> Q: Now, when you got down to Export, isn't it a fact that you went and bought some marijuana?
>
> A: Not that I could recall, no, sir.  I don't remember buying any marijuana.
>
> Q: You don't remember that.  You don't remember all of you going in a car to somebody's house for the expressed purpose of getting marijuana before you started your trip to New Mexico or Mexico or Kentucky or wherever you were going?  You don't have a recollection of that?
>
> A: No, sir.  Not that I could remember, no.
>
> Q: The next thing you know you were on I-279 and you were headed south?
>
> A: Yes, sir.
>
> Q: You had no idea where you were going?
>
> A: No, sir.

Id., p.137.

Deiseroth appeared before the jury and testified that at 9:00 a.m. on May 13, 1990,

Cowfer arrived and entered her Lower Burrell residence with "some other kid."  (ECF No. 72-2,

p.5.)  Cowfer asked to see Mayhugh and she then observed Cowfer "kneeling down talking to

Leonard down beside the couch."  Id., pp.5-6.  She testified that while Cowfer was speaking to

Mayhugh, she heard the following:

> Well, Sherman [Cowfer] said, I never thought I could do it.  Leonard [Mayhugh] says, what are you talking about.  I never thought I could do it.  I killed somebody.  Come on, Sherman, you didn't do nothing like that, he said.  Yes, I did.  He said, we pushed him over the quarry and blub, blub, blub, to the bottom of the quarry he went.

Id., p.6.  When asked how Cowfer arrived at her home, Deiseroth testified that he arrived in "a

little, blue car" and that there were two other people in the car in addition to the individual that

4

came into her home with Cowfer.  <u>Id</u>.  She testified that she smelled alcohol on Cowfer's breath.

<u>Id</u>., p.12.  After Cowfer finished speaking with Mayhugh, he "and the other kid got up and left."

<u>Id</u>., pp.6-7.  During cross-examination by Cowfer's attorney, Deiseroth stated that she did not

speak with the police until one week prior to trial and did not know the individual who

accompanied Cowfer.  <u>Id</u>., pp.10-11.  This individual did not speak while at her home.  <u>Id</u>., p.11.

When it came time for Vogt's counsel to cross-examine Deiseroth, the following sidebar

exchange occurred between counsel, the court and the prosecutor:

> [Counsel for Vogt]:    If the Court please, I'm going to request if there are any
> additional witness statement - - this girl last indicated she made a written
> statement she signed.  We got a synopsis of what she said which was given to us
> by Mr. Shaffer.  But there is no question that what this girl has testified to
> certainly is exculpatory as it applies to my client and therefore I believe it comes
> under the Brady Rule that we should have that kind of information.  Her statement
> that was given to us did not go to the depth that this goes into.
>
> [The prosecutor]:        There was no - - as far as I am aware, there is no written
> statement that she made.
>
> [Counsel for Vogt]:    Okay.  That's the second phase.  If in fact there is not
> written statement and she is now testifying she gave a written statement that was
> signed, that is something that can be used relative to impeachment of this
> particular witness.  And bear now, of course, Bill, you had no idea she was going
> to testify there was a written statement that was signed by her.  But I think that we
> are entitled - -
>
> [The prosecutor]:        Let me confer with the Trooper.
>
> The Court:      Let's get that clarified now before she leaves the stand.
>
> [The prosecutor]:        I disagree.  It's inexculpatory.
>
> The Court:      I don't believe this other party was with this defendant.
>
> [Counsel for Vogt]:    You are going to hear from the other party later if what we
> understand if McClearn in his statement he was with none of the people sitting
> here.

<u>Id.</u>,12-14.  It was subsequently confirmed that there was no written statement.  <u>Id.</u>, p.14.

Deiseroth was not cross-examined by counsel for Vogt.  <u>Id.</u>, p.15.

Next, Mayhugh testified.  He testified that on May 13, 1990, Cowfer and "a friend"

showed up at his house.

> And he come in and he kneeled down and he was talking to me.  And he says to me, he says, I don't believe I did it.  He goes, never thought I could do something like that, but I killed someone.  And I really didn't know if he was telling the truth like joking around or serious, but the more I looked at him I knew that he must have. . . .  He said he had been out partying and that he says that someone was giving him trouble or something like that.  And he told him to come over here and he was showing somebody to look over this hill.  And he said, I run and I pushed him over the hill.  And he says after that he says he went down over the hill.  He said, we did - - he said we went over the hill and they drownt this guy.  I mean, I didn't know who it was and that.  And I listened to the news and that and I heard about a guy found in the pond.  But - - and Sherman [Cowfer] said that he drownt somebody in the quarry.

<u>Id.</u>, pp.16-17.  During cross-examination by Cowfer's counsel, Mayhugh testified that "the only

thing that was on my mind was whether he did it or he didn't do it.  I was upset because I never

thought Sherman [Cowfer] would do something like that."  <u>Id.</u>, p.19.  The following exchange

later occurred:

> Q:     He came to your home with somebody else.  Did you recognize that individual?
>
> A:     Yes, I did.  But I didn't know him.  I don't know the guy.
>
> Q:     You didn't know him.
>
> A:     Right.  He says he was just a friend of his.
>
> Q:     This guy had never been to your house before?
>
> A:     No.
>
> Q:     But you recognized him?
>
> A:     Right.

6

Id., p.20-21.

Counsel for Cowfer attacked the credibility of Deiseroth and Mayhugh during closing

argument.  She argued as follows to the jury:

> . . . .  Now, I think those two individuals create a very, very odd situation
> here.  We have two people that knew of a death in May of last year, that's nine
> months ago.  Don't you think it's a little bit odd that up until a week ago they
> weren't involved in this case.  Look at what they are saying to you.  They are
> saying that Walter [Cowfer], a person that they haven't seen in over a year, comes
> to their house and admits that he committed a crime.  And it's not just any crime.
> What they are saying is he admits that he committed a murder.  Why would
> Walter [Cowfer] do that?  Why would Walter [Cowfer] go to these people who he
> hasn't seen in a year to do that?  That doesn't make sense to do that under the
> circumstances to do that.  In this alleged admission Walter [Cowfer] is supposed
> to have said, I did this.  That doesn't make sense either especially if you consider
> the fact that he is in these people's house with somebody else.  Why would you
> do this?  And what about the changes these people made in their statements.
> What happened was the details of the case had all been made public.  This was all
> published.  They told you they read about it.  They told you they talked about it
> with friends and relatives.  They were interested in the case.  Why?  Because they
> knew Walter [Cowfer].  This was a guy that had lived with them.  Might not have
> been a long period of time, but he lived with these people.  So, what really
> happened here and why did we hear from these two people?  I think we heard
> from these two people because last week the Commonwealth looked at their case
> and they looked at the evidence they have or in my opinion the lack of evidence
> they had with regard to Mr. Cowfer, and they looked for somebody that knew my
> client.  Because if you look at the people that were allegedly involved in this,
> nobody knew my client that well.  Mike Sopo says, I hardly knew Walter Cowfer
> at all.  And Mr. McClearn doesn't say he knew of him any better.  If what they
> say is really true, why did it take nine months for them to come forward and be
> involved in this matter.

Id., pp.32-34.  Counsel for Vogt did not mention Deiseroth and Mayhugh during his closing

argument.

McClearn testified at trial and recounted the events that led up to their arrival at Cupec's

Lake.  (ECF No. 72-2, pp.38-40.)  McClearn told the jury that he, Vogt, Cowfer and Landry got

out of the car and walked into the woods.  Id., p.40.  Vogt and Cowfer instructed McClearn to just follow the path as it led to the lake.  Id.  McClearn then testified as follows:

> Mr. Landry was complaining about his chest hurting.  So we stopped for a few seconds.  He said he didn't want to go any more.  Steve [Vogt] said, I'll help him.  He took him by his arm and his elbow and was helping him walk.  He stopped again.  He said his chest was hurting him bad, he didn't want to go any further.  We stopped.  I turned around.  Walt [Cowfer] said, here, he threw me a wallet and he told me to see if there was any money in it.

Id., pp.40-41.  McClearn testified that he opened the wallet, which belonged to Landry, determined it was empty and threw it back to Cowfer.  Id., p.41.  He testified that as he turned around to walk away, he heard Landry yell.  Id.  When he turned around, he saw Landry going over the hill into the lake.  Id.  According to McClearn, Landry was yelling, "Don't do me, I'll give you $5,000.00," then after a little while he yelled, "Don't do me, I'll give you $10,000."  Id., pp.41-42.  McClearn testified that he walked away to another spot in the woods and stayed there for an hour or longer.  Id., p.42.  He could hear rocks hitting the water and heard Landry yell a few times more before he didn't hear him anymore.  Id.  He stated that he turned around to walk back and saw Landry over the hill in the water.  Id.  He also stated, "Every once in a while you could see his feet, you could see ripples come out into the water."  Id.  He testified that Vogt asked him to help him get a rock, and he helped him set a rock up on the bank that eventually went down over the hill.  Id.  When McClearn started to leave, Cowfer asked him to get a rope, which he did.  Id.  He then saw Vogt go down over the hill to where Landry was and then saw Landry pushed out from the shore.  Id.  He testified that Landry tried to tread water but "went under," and then he turned around and went back to the car.  Id.  He stated that once he returned to the car, Vogt and Cowfer emerged from the woods and the group hung around for a few minutes drinking beer.  Id., p.43.  Sopo asked where Landry was and someone said "Frank's

8

swimming."  Id.  He testified that Zawodniak was asleep in the back seat, then everyone got in

the car and they left.  Id.  When asked where they went, McClearn testified as follows:

> Someplace around New Kensington or Tarentum, first.  We dropped Maggie
> [Zawodniak] off.  From there we went a little farther.  I'm not sure how far it was.
> We stopped at another guy's house, bought $10.00 worth of marijuana . . .  We
> left the man's house.  We went back to Export.  We got to my house, first, went in
> and got clothes.  From my house we went to Walt's [Cowfer].  Walt [Cowfer]
> went in his house and got a jacket, clothes, shoes.  I don't know what else he got.

Id.

During cross-examination by Vogt's attorney that spanned 86 pages of the trial transcript,

McClearn agreed that he plead guilty to criminal charges even though he was not guilty of

committing them because he wanted to obtain a good deal for himself.  Id., pp.49-51.  McClearn

stated that he was guilty "just for being there."  Id., p.52.  The following exchange then occurred:

> Q:     Can you tell me whether or not at the time that you entered into this plea
>        agreement if you were told by the District Attorney's Office or by your
>        attorney that in fact you might be facing the death penalty?
>
> A:     They told me I might be facing the death penalty.
>
> Q:     Was that one of the reasons you agreed to plead guilty to these things that
>        you now say you didn't do?
>
> A:     Yes, it was.

Id., p.53.  Counsel then reviewed all of the maximum sentences associated with the crimes to

which McClearn pled guilty, pointing out that McClearn only received a sentence of four to eight

years in light of the plea agreement.  Id., pp.53-54.  McClearn was then questioned about all of

the alcohol he consumed on May 12, 1990, as well as his ingestion of Percocets and marijuana.

Id., pp.55-59, 66.

As far as his relationship with Cowfer, McClearn testified that he had known Cowfer

approximately one and one-half months prior to Landry's murder and agreed that their

acquaintance basically centered around drinking.  Id., pp.59-60.  With respect to Vogt, McClearn

stated that he had never met Vogt prior to the evening in question.  Id., p.61.  During cross-

examination, McClearn was questioned about inconsistencies between his statements to police,

his preliminary hearing testimony, and his trial testimony.  Id., pp.81-83, 90-93, 104-07, 110-13.

The following exchange occurred at the end of the cross-examination by Vogt's attorney:

> Q:      Then is it also the truth that you in fact did commit murder?
>
> A:      No, it's not.
>
> Q:      That you did in fact kidnap somebody?
>
> A:      No.
>
> Q:      You made a deal to help yourself, right?
>
> A:      Yes.

Id., p.134.  He was not questioned about making a stop at the home of Deiseroth and Mayhugh.

During closing arguments, counsel for Vogt vigorously challenged McClearn's credibility.  (ECF

No. 72-3, pp.50-57.)  There was no mention of the individual who accompanied Cowfer into the

home of Deiseroth and Mayhugh.

Vogt's judgment of sentence became final on September 23, 1993, ninety days after the

Pennsylvania Supreme Court denied his Petition for Allowance of Appeal and the time for

seeking discretionary review by the United States Supreme Court had expired.  Nearly four years

later, in September 1997, Vogt filed his first PCRA petition.  (ECF No. 14-7.)  A counseled

amended PCRA petition followed wherein it was asserted that Vogt was entitled to relief due to

newly discovered evidence in the form of handwritten letters written by Cowfer in July 1991 and

March 1997 and addressed to Vogt's trial counsel.[3]  (ECF No. 14-8.)  In the letters, Cowfer

stated that had he testified he would have testified that Landry died as a result of an accident

whereby he and McClearn jokingly pushed Landry but Landry lost his balance and fell over the

edge.  He said that Vogt, while there, did not push Landry and actually went down the rope in an

attempt to help him.  Id., pp.13-18.  Oral argument was scheduled in connection with the

amended petition for December 7, 1998; however, on that date, Vogt voluntarily withdrew his

petition.  The PCRA court specifically noted that Cowfer had been transported to the Butler

County Prison and was available for the hearing.  Vogt still elected to withdraw his PCRA

petition.  See ECF No. 14-17, p.10.

Vogt filed a second PCRA petition in July 2004, wherein he asserted that on May 28,

2004, he discovered for the first time that, pursuant to a plea agreement, Sopo plead guilty to the

offenses of burglary and conspiracy to commit burglary on January 14, 1991.  The plea

agreement made reference to the homicide case where Sopo was a co-defendant with Vogt, but

Vogt maintained that he had no prior knowledge of Sopo's conviction or of the associated plea

agreement wherein Sopo agreed to testify against Vogt at the homicide trial in exchange for his

sentence.  (ECF No. 14-9.)  A counseled amended petition was filed on behalf of Vogt on July

26, 2004, raising this issue and a related claim that trial counsel was ineffective for failing to

make sufficient use of Sopo's burglary conviction during cross examination to attack the

credibility of Sopo and also failed to make adequate use of the plea agreement to demonstrate

that Sopo was biased against Vogt.  The counseled petition also once again referenced Cowfer's

1991 and 1997 letters and claimed that all prior counsel were ineffective in failing to raise or

---

[3] In an affidavit dated June 4, 1998, Cowfer stated that he did not send a copy of the July 1991 letter to Vogt, but he
did send him a copy of the March 1997 letter.  (ECF No. 14-8, p.12.)

preserve the issues relating to the exculpatory evidence contained therein.  Additional claims of ineffective assistance of counsel for failing to file a motion to sever and to call character witnesses were also raised in the amended petition.  (ECF No. 14-10.)  Counsel thereafter filed a second amended PCRA petition on November 17, 2004, which included a new claim that trial counsel was ineffective for not taking legal measures to prevent Deiseroth and Mayhugh from testifying that Cowfer was accompanied by an unidentified individual when he confessed to committing a criminal homicide during a visit to their residence, failed to request that the court limit their testimony so that the jury would not be permitted to hear any reference to the individual who accompanied Cowfer into the residence, failed to establish the unnamed person's identity through an adequate pretrial investigation and failed to request that the court instruct the jury to draw no adverse inference against Vogt from their testimony.  He claimed that such testimony deprived Vogt of his fundamental right to a fair trial for the reason that such testimony created the impermissible inference that Vogt, who was the only male on trial with Cowfer, accompanied Cowfer to the residence and stood by in silence as Cowfer described the details of the homicide.  Counsel also set forth an argument that it would constitute prosecutorial misconduct in the event it would be established at an evidentiary hearing that the police or prosecutors knew of the unnamed person's identity but failed to reveal it to the defense.  The second amended PCRA petition also included a new "affidavit" from Cowfer dated September 23, 2004, wherein Cowfer stated that it was McClearn who accompanied him into the residence of Deiseroth and Mayhugh to purchase marijuana when Cowfer confessed to the murder and that Vogt remained in the car with Sopo and Zawodniak.  (ECF No. 14-11.)  A hearing on the timeliness of the petition was subsequently held on January 27, 2006.  (ECF No. 83-1.) Following the submission of post-hearing briefs by the parties, the PCRA court denied relief in

an order and opinion dated July 12, 2006.  (ECF Nos. 14-13; 14-14, pp. 25-29.)  A supplemental

memorandum opinion was subsequently issued by the PCRA court on August 29, 2006.  (ECF

No. 72-6.)  The Superior Court affirmed the denial of PCRA relief on October 24, 2007.

Specifically, with respect to the issue of Sopo's plea agreement, the Superior Court noted that

Vogt's trial counsel revealed at the hearing held in January 2006 that he knew of the entire plea

agreement at the time of Vogt's trial, including Sopo's plea to the charges of burglary and

conspiracy in the separate matter, but he explained that, as a matter of trial strategy, he did not

question Sopo regarding the specific charges to which he had pleaded guilty because, in his

opinion, Sopo did not receive a "sweetheart deal."  With respect the information contained in

Cowfer's affidavit dated September 23, 2004, which identified McClearn as the person who

accompanied Cowfer into the residence of Deiseroth and Mayhugh that morning, the Superior

Court found that Vogt had failed to demonstrate that he could not have uncovered the

information earlier through the exercise of due diligence and specifically pointed out that Vogt

had the opportunity to question Cowfer under oath at the scheduled evidentiary hearing on

December 7, 1998, but he declined to do so electing to withdraw his petition instead.  (ECF No.

14-17.)  Vogt next sought discretionary review in the Pennsylvania Supreme Court, which was

denied on April 8, 2008.  (ECF No. 14-20.)  Many years later, in October 2015, Vogt filed a

motion in the Superior Court to reopen and reconsider the denial of his appeal in light of

Commonwealth v. Burton, 121 A.3d 1063 (Pa. Super. 2015).  (ECF No. 72-7.)  His motion was

denied on October 23, 2015.  (ECF No. 72-8.)

Since he initiated these habeas proceedings in April 2008, Vogt has filed three more PCRA petitions in state court, and each has been denied. *See* Commonwealth v. Vogt, CP-10-CR-0030816-1990 (Butler Cty. Ct. of Comm. Pleas).[4]

## II.    Federal Habeas Corpus Proceedings

Vogt's Petition for Writ of Habeas Corpus ("Petition") was dated April 14, 2008 and docketed on April 16, 2008.  (ECF No. 4.)  In his Petition, Vogt raised the following claims.

1.  Prosecutorial misconduct in illegally suppression/withholding [sic] Brady material; the identity of male party to confession.

2.  Prosecutorial misconduct in illegally redacting trial testimony of Com. witnesses Deiseroth and Mayhugh.

3.  Prosecutorial misconduct in the knowing use of false evidence to convict Petitioner.

4.  Prosecutions [sic] knowing use of false evidence when it elicited only some of the details of witness Sopo's plea agreement.

---

[4] The docket sheet for Vogt's criminal case is accessible online via ujsportal.pacourts/us/CaseSearch.  It shows that a third PCRA petition was filed by Vogt on October 22, 2010, which was denied on November 16, 2010.  The Superior Court affirmed the denial of relief on October 19, 2011.  *See* Commonwealth v. Vogt, No. 153 WDA 2011, unpublished memorandum (Pa. Super. Ct. Oct. 19, 2011).  A fourth PCRA petition was filed on August 22, 2012, which was denied on January 3, 2013.  The Superior Court affirmed the denial of relief on October 4, 2013.  *See* Commonwealth v. Vogt, No. 188 WDA 2013, unpublished memorandum (Pa. Super. Ct. Oct. 4, 2013).  A fifth PCRA petition was filed on June 12, 2017, which was denied on June 23, 2017.  On appeal, the Superior Court vacated the PCRA court's order and remanded for consideration of the timeliness of the petition.  *See* Commonwealth v. Vogt, No. 1010 WDA 2017 (Pa. Super. Ct. Mar. 28, 2018).  Counsel was appointed who filed an amended PCRA petition on behalf of Vogt on January 7, 2019.  Following a hearing on August 26, 2019, the PCRA court determined that Vogt's fifth PCRA petition was timely filed.  A hearing on the merits of Vogt's fifth PCRA petition was held on March 8, 2021, and the PCRA court denied the petition on September 29, 2021.  An appeal of that decision is currently pending in the Superior Court.  *See* Commonwealth v. Vogt, No. 1186 WDA 2021 (Pa. Super. Ct.)

The subject of Vogt's fifth PCRA petition was a letter allegedly written to Vogt by McClearn dated October 23, 2016, months before his death, wherein he recanted his trial testimony and admitted that it was he and Cowfer who killed Landry that night while Vogt was passed out drunk in the car.  The letter was solely typewritten, including the signature, and was received by Vogt in an interdepartmental mail envelope delivered to his cell on May 17, 2017.  The PCRA court found none of the evidence Vogt presented was sufficient to authenticate the typewritten letter and therefore denied Vogt's petition.

On January 8, 2010, this Court dismissed the Petition as untimely, finding that it was not filed within the AEDPA's one-year statutory limitations period, *see* 28 U.S.C. § 2244(d), for any of his claims. (ECF No. 24.) Specifically, with respect to Vogt's first three claims, which all concerned information he supposedly gained through Cowfer's affidavit dated September 23, 2004, this Court stated that it was bound by the Superior Court's factual findings relating to Vogt's lack of diligence in discovering the factual predicate for his claims because he could have questioned Cowfer during the scheduled hearing on December 7, 1998, but chose to withdraw his PCRA petition instead. Id., pp.10-11. Vogt then appealed and the Third Circuit Court of Appeals denied his request for a certificate of appealability on May 24, 2010. (ECF No. 30.)

Vogt filed his first Rule 60(b) motion on September 24, 2010. (ECF No. 31.) In that motion, he argued that the Court's order of dismissal should be vacated because he had new evidence that proved his innocence; specifically, an affidavit from Zawodniak dated August 27, 2010, stating that Vogt severely injured his ankle from a drunken fall earlier that night and was too intoxicated to have played a part in Landry's death. She claimed that on the night Landry was killed Vogt was with her in the car or just right outside of it throwing up. Vogt also had an affidavit from Tricia Holfelder, his assistant, who stated that she had spoken to Sopo, and, although he was too reluctant to provide a sworn statement, he represented to her that Vogt had nothing to do with Landry's death. Sopo also presumably relayed to Holfelder that his testimony was coerced. Finally, Vogt provided the Court with the March 1997 letter written by Cowfer, which stated that Vogt was innocent. Vogt's Rule 60(b) motion was denied because he had not first exhausted his newly discovered evidence claim in the state courts. (ECF No. 32.) His request for reconsideration of that order was also denied. (ECF No. 33 and Text Order dated October 14, 2010.) He then filed an appeal to the Third Circuit, which denied his request for a

certificate of appealability on February 7, 2011, stating in its order that it was not settled law that actual innocence could serve as a basis for overcoming AEDPA's statute of limitations, and, to the extent that it could, Vogt's evidence did not establish such innocence.  (ECF No. 36.)

Vogt filed his second Rule 60(b) motion on November 17, 2011, again asserting that he had evidence to establish his actual innocence – the aforementioned affidavits from Zawodniak and Holefelder and the letter from Cowfer.  (ECF No. 37.)  Vogt stated that, in accordance with the Court's previous order, he attempted to exhaust his innocence claim in state court by filing another PCRA petition but that the trial court denied the petition stating that Vogt had failed to prove that the new evidence would have changed the outcome of the trial.  Vogt's Rule 60(b) motion was denied in accordance with the directive issued by the Third Circuit denying his previous request for a certificate of appealability with respect to his first Rule 60(b) motion. (Text Order dated November 22, 2011.)  His motion for reconsideration of that order was denied on December 6, 2011.  (ECF No. 39 and Text Order dated December 6, 2011.)

Subsequently, Vogt filed an application to the Third Circuit for permission to file a second or successive federal habeas petition based on the Supreme Court's decision in <u>Martinez v. Ryan</u>, 132 S. Ct. 1309 (2012), which held that ineffectiveness of post-conviction counsel can serve to excuse a procedural default of claims alleging trial counsel ineffectiveness.  His request was denied on June 11, 2012.  *See* <u>In re: Steven David Vogt</u>, C.A. No. 12-2455 (3d Cir.).

Vogt filed his third Rule 60(b) motion on July 9, 2012, also based on <u>Martinez v. Ryan</u>, 132 S. Ct. 1309 (2012), and this Court denied the motion on July 18, 2012.  (ECF Nos. 40, 41.)

One year later, on July 19, 2013, Vogt filed his fourth Rule 60(b) motion, which was based on <u>McQuiggin v. Perkins</u>, 133 S. Ct. 1924 (2013), where the Supreme Court held that a "colorable" claim of actual innocence constitutes an equitable exception that can overcome the

bar of AEDPA's one-year statute of limitations.  (ECF No. 42.)  This Court denied Vogt's

motion on December 16, 2013, after finding that the evidence he presented did not establish his

innocence such that it was more likely than not that no reasonable juror would have voted to

convict him.  (ECF No. 47.)

       In his fifth Rule 60(b) motion filed on January 23, 2017, Vogt sought relief pursuant to

Dennis v. Secretary Pennsylvania Department of Corrections, 834 F.3d 263 (2016).  (ECF No.

49.)  Vogt argued that he was entitled to Rule 60(b) relief pursuant to Dennis and requested that

the Court reopen this case and review his claim that the prosecution withheld evidence in

violation of Brady v. Maryland, 373 U.S. 83 (1963), the identity of the unidentified male who

accompanied Cowfer into the residence of Deiseroth and Mayhugh.  The Court denied the

motion on May 25, 2017, after finding that nothing in Dennis warranted Vogt Rule 60(b) relief.

(ECF No. 50.)  The Court denied reconsideration of that order on June 8, 2017, and the Third

Circuit denied Vogt's request for a certificate of appealability on September 11, 2017.  (ECF

Nos. 51, 52, 55.)

       In his current Rule 60(b) motion, Vogt argues that he is entitled to Rule 60(b) relief

because Bracey v. Superintendent Rockview SCI, 986 F.3d 274 (3d Cir. 2021), held that Dennis

caused a material change in the relevant law with respect to the reasonable expectations of a

petitioner who asserts a claim premised on undisclosed Brady material.  In an order dated April

27, 2021, this Court directed Respondent to file a response to Vogt's Rule 60(b) motion

addressing the following: (1) the applicability of Bracy and Dennis to Vogt's situation; (2) the

factors discussed in Cox v. Horn, 757 F.3d 113 (3d Cir. 2014), which the Third Circuit stated a

district court should consider when deciding whether a petitioner requesting Rule 60(b)(6) relief

has shown "extraordinary circumstances where, without such relief, an extreme and unexpected

hardship would occur[;]" (3) the timeliness of Vogt's first claim under 28 U.S.C. §

2244(d)(1)(D), using September 23, 2004 as the trigger date, including the applicability of any

statutory or equitable tolling, and (4) the merits of Vogt's first claim.  Respondent was also

ordered to furnish the Court with all relevant state court records, including trial and post-

conviction hearing transcripts, all briefs filed by both Vogt and the Commonwealth, and all

written opinions of the state courts.  (ECF No. 59.)  The response to the Rule 60(b) motion was

filed on June 16, 2021, with an appendix of exhibits filed the day before and another exhibit filed

on August 4, 2021.  (ECF Nos. 72, 74, 83.)  Vogt filed a reply brief on July 8, 2021.  (ECF No.

78.)  The motion is now ripe for review.

**III.**   **Discussion**

    **A.  Vogt's Rule 60(b) motion**

Federal Rule of Civil Procedure 60(b) allows a party to seek relief from a final judgment,

and request reopening of his case, under a limited set of circumstances, including (1) mistake,

inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable

diligence, could not have been discovered in time to move for a new trial; (3) fraud or

misconduct by an opposing party; (4) because the judgment is void; (5) because the judgment

has been satisfied, released or discharged; and (6) any other reason that justifies relief.  Fed. R.

Civ. P. 60(b).  Vogt specifically invokes Rule 60(b)(6).  A court may grant equitable relief under

Rule 60(b)(6) "in extraordinary circumstances where, without such relief, an extreme and

unexpected hardship would occur."  Cox v. Horn, 757 F.3d 113, 120 (3d Cir. 2014) (citation and

internal quotation marks omitted).  The petitioner "bears the burden of establishing entitlement to

such equitable relief," but the District Court "must consider the full measure of any properly

presented facts and circumstances attendant to the [petitioner's] request."  Id. at 122.

In his Rule 60(b) motion, Vogt argues that he discovered the factual predicate for his Brady claim, which was claim one raised in his Petition, by way of the affidavit from Cowfer dated September 23, 2004. As discussed *supra*, the affidavit identified McClearn as the person who accompanied Cowfer into the residence of Deiseroth and Mayhugh that morning after Landry's murder. Vogt maintains that he has no memory of that event and, prior to receiving the affidavit from Cowfer, he believed that it was he who had been with Cowfer as Cowfer confessed to Deiseroth and Mayhugh, especially because the prosecutor represented to the trial court that the identity of the man was not exculpatory to Vogt. He claims that this is also why he did not put Cowfer on the stand to testify about the man's identity at the hearing on his first PCRA petition that was scheduled for December 7, 1998. Vogt claimed in his habeas Petition that the prosecutor deliberately withheld McClearn as the name of this "unidentified" man in violation of Brady so that the jury would believe that it was he, the only other male on trial with Cowfer, who accompanied Cowfer into the residence and silently agreed to complicity in the crime. Vogt states that he attempted to obtain relief for this claim in state court in his second PCRA petition, but the PCRA court ruled that his petition was untimely and did not meet any statutory exception to the time for filing a timely PCRA petition under 42 Pa.C.S. § 9545(b) because he could have discovered the information in Cowfer's affidavit about the identity of the man who accompanied him into the residence sooner if he had exercised any amount of due diligence. *See* ECF No. 14-14, p.29. On appeal, the Superior Court also found that Vogt could have uncovered the information sooner through the exercise of due diligence, particularly because Vogt had the opportunity to question Cowfer under oath at the scheduled evidentiary hearing for his first PCRA petition on December 7, 1998, but he declined to do so and chose instead to withdraw his petition. *See* ECF No. 14-17, pp.10-11. While in his Petition before this

19

Court Vogt stated that his first three claims concerned information that he supposedly gained through Cowfer's September 23, 2004 affidavit, this Court stated that it was bound by the Superior Court's factual findings relating to Vogt's lack of diligence in discovering the factual predicate for his claims and found that as to those claims, under 28 U.S.C. § 2244(d)(1)(D),[5] Vogt's one-year limitations period under AEDPA's statute of limitations ended on January 7, 2000, rendering those claims untimely.  (ECF No. 24, pp.8-11.)  Vogt now claims that this Court must vacate its decision because recent Third Circuit precedent has changed what § 2244(d)(1)(D)'s "due diligence" requirement demands of <u>Brady</u> claimants.

    **B.** ***Brady*, *Dennis* and *Bracey***

In <u>Brady</u>, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.  To constitute a <u>Brady</u> violation, the undisclosed evidence must meet three criteria:  "'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and, prejudice must have ensued.'"  <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004) (quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999)).  In other words, a petitioner must establish both "that evidence in the possession of the government was actually suppressed, and . . . that the suppressed evidence was material."  <u>Slutzker v. Johnson</u>, 393 F.3d 373, 386 (3d Cir. 2004).  Materiality "is a 'reasonable probability' of a different result" which is

---

[5] This section requires a defendant attacking his state conviction to petition the federal courts within one year of "the date on which the factual predicate of the claim . . . could have been discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D).

"shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." Kyles v. Whitley, 514 U.S. 419, 434 (1995) (internal quotations omitted).

The requirements of Brady were examined in Dennis.  In Dennis, the petitioner filed a habeas petition wherein he averred that the Pennsylvania Supreme Court had unreasonably applied Brady with respect to three pieces of evidence withheld by the Commonwealth at trial: (1) a Department of Public Welfare (DPW) receipt corroborating his alibi; (2) a police activity sheet memorializing that a witness had given a previous statement that was inconsistent with her trial testimony; and (3) documents regarding a tip from an inmate detailing his conversation with a man other than the petitioner.  834 F.3d at 275.  The district court granted the petition and appeal to the Third Circuit followed.

With respect to the receipt, the Commonwealth argued that because Dennis' appellate counsel was able to obtain the receipt from DPW post-trial, the prosecution had no responsibility to turn it over to trial counsel when the receipt came into its possession.  See id. at 289.  The Third Circuit observed that "the United States Supreme Court has never recognized an affirmative due diligence duty on the part of defense counsel as part of Brady."  Id. at 290.  It stated, "The Supreme Court has noted that its precedent 'lends no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed.'"  Id. (citing Banks, 540 U.S. at 695).  The Third Circuit went on to state that

> [w]hile we think that the United States Supreme Court has made it clear that Brady requires the prosecution to turn over all material favorable evidence in its possession, we acknowledge that it is not totally frivolous under our Third Circuit jurisprudence for the Commonwealth to have argued, as it did here, that because defense counsel could or should have discovered the Cason receipt with due diligence, the prosecution was not required to disclose it.  That is because our case law, as we discuss below, is inconsistent and could easily confuse.  Thus, we need

21

to clarify our position:  the concept of "due diligence" plays no role in the <u>Brady</u> analysis.  To the contrary, the focus of the Supreme Court has been, and it must always be, on whether the government has unfairly "suppressed" the evidence in question in derogation of its duty of disclosure.  <i>See</i> <u>Gov't of the V.I. v. Mills</u>, 821 F.3d 448, 460 n.10 (3d Cir. 2016) ("The critical question in assessing constitutional error is to what extent a defendant's rights were violated, not the culpability of the prosecutor." (quoting <u>Marshall v. Hendricks</u>, 307 F.3d 36, 68 (3d Cir. 2002)).

<u>Dennis</u>, 834 F.3d at 291-92 (footnotes omitted).

With respect to "suppression," the Third Circuit in <u>Dennis</u> went on to note that "[o]nly when the government is aware that the defense counsel already has the material in its possession should it be held to not have 'suppressed' it in not turning it over to the defense.  Any other rule presents too slippery a slope."  <u>Id</u>. at 292.  The court concluded that "[t]o the extent that we have considered defense counsel's purported obligation to exercise due diligence to excuse the government's non-disclosure of material exculpatory evidence, we reject that concept as an unwarranted dilution of <u>Brady</u>'s clear mandate."  <u>Id</u>. at 293.  The court further stated that "[a]ll favorable material ought to be disclosed by the prosecution.  To hold otherwise would, in essence, add a fourth prong to the inquiry. . . ."  <u>Id</u>.

The applicability of <u>Dennis</u> on the due diligence requirement found in 28 U.S.C. § 2244(d)(1)(D) was examined in <u>Bracey</u>.  In <u>Bracey</u>, the defendant was convicted of murder and the Commonwealth relied heavily upon the testimony of two cooperators.  986 F.3d at 279. While the fact that they received favorable plea agreements in exchange for their testimony was disclosed during trial, Bracey learned 15 years later that the Commonwealth had only disclosed some of the cases that were pending against these witnesses.  <u>Id</u>.  The Commonwealth had also withdrawn a second set of charges that had been pending against one of these witnesses.  <u>Id</u>. Armed with this newly discovered information, Bracey filed a PCRA petition that was dismissed

as time-barred based upon a finding that the factual basis of his claim could have "been ascertained [earlier] by the exercise of due diligence."  Id. at 279-80 (citing 42 Pa.C.S. 9545(b)(1)(ii).  Bracey then sought relief in federal court through the filing of a habeas petition. The petition was dismissed as untimely pursuant to 28 U.S.C. § 2244(d)(1)(D).  Id. at 280.  The district court reasoned that regardless of the prosecution's lack of full disclosure, Section 2244(d)(1)(D) requires a defendant who is aware of witnesses' favorable plea agreements to continually seek out "the full extent of those plea agreements," even after conviction.  Id.  The district court went on to state that "because the full extent of the plea agreements and the sentences received by the witnesses were a matter of public record, Bracey could have found the factual predicate of [his Brady] claim through the exercise of due diligence well before October 2010, meaning that he had filed his petition more than one year after the 'factual predicate' for his Brady claim could have been discovered through the exercise of due diligence, 28 U.S.C. § 2244(d)(1)(D)."  Id. at 280 (internal quotations and citations omitted).  A certificate of appealability was subsequently denied.  Id.  Following the decision in Dennis, Bracey returned to the district court through the filing of a Rule 60(b) motion wherein he contended that the district court had erred in dismissing his petition pursuant to Section 2244(d)(1)(D) because "there is no due diligence requir[e]ment under Brady for defendants to discover impeachment material and it is stric[t]ly the duty of the prosecutor to provide this information."  Id.  The district court denied the motion without reference to Dennis's effect on its previous decision dismissing Bracey's habeas petition, and Bracey sought a certificate of appealability.  Id. at 281.

The Third Circuit noted that at the heart of the appeal lie two questions about Section 2244(d)(1)(D)'s requirement that a defendant who is attacking his state conviction must petition the federal courts within one year of "the date on which the factual predicate of the claim . . .

23

could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D).

Those questions were as follows: (1) "First, if a defendant reasonably expects that the

prosecution has complied with its obligations under <u>Brady</u>, but later discovers that the

prosecution withheld material exculpatory evidence in its possession, does the fact that the

withheld evidence could have been found in public records mean the defendant has failed to

'exercise . . . due diligence?'", and (2) "Second, what, if anything, is the relevance of . . . <u>Dennis</u>,

which rejected the notion that a defendant has a duty to search public records for undisclosed

<u>Brady</u> material because, we held, <u>Brady</u> focuses entirely on the prosecution's affirmative duty of

disclosure and permits defendants to expect that government officials will comply with that

duty?" <u>Id</u>. at 278.  At the outset, the Third Circuit observed:

> <u>Dennis</u> effected a material change in Circuit law with respect to the reasonable
> expectations of a <u>Brady</u> claimant:  While we had previously suggested that
> defendants had to search for exculpatory evidence themselves, <u>Dennis</u> made clear
> that a defendant can reasonably expect – and is entitled to presume – that the
> government fulfilled its <u>Brady</u> obligations because the prosecution's duty to
> disclose is absolute and in no way hinges on efforts by the defense.  By altering
> the factual predicate and baseline expectations for <u>Brady</u> claims, <u>Dennis</u>
> correspondingly changed what § 2244(d)(1)(D)'s "due diligence" requirement
> demands of <u>Brady</u> claimants.

<u>Bracey</u>, 986 F.3d at 279.

Observing that Bracey was seeking Rule 60(b) relief based upon an intervening change in

law, the Third Circuit noted that the following issues needed to be addressed: (1) Whether the

asserted change was material to the basis upon which the district court initially denied relief; and,

(2) If so, whether the district court analyzed the 60(b) motion in accordance with the multi-factor

analysis set forth in <u>Cox</u>.  <u>Id</u>. at 284.

The Third Circuit went on to examine why <u>Dennis</u> constituted a material change in

decisional law.  It first noted that due diligence for the purpose of Section 2244(d)(1)(D) "does

not impose a one-size-fits-all requirement." Id. at 285.  Instead, it depends on the circumstances

of each petitioner.  Id.  Citing Wilson v. Beard, 426 F.3d 653 (3d Cir. 2005), the Third Circuit

reaffirmed that a petitioner must exercise "reasonable diligence in the circumstances," and such

an inquiry "is context-specific." Id. at 286 (citing Wilson, 426 F.3d at 660, 661.)  It emphasized

that "a petitioner will have an obligation to investigate only once he has a 'reasonable basis . . .

to expect that [investigation] would uncover . . . relevant information.'  In short, unless 'the

petitioner should be expected to take actions which would lead him to the information,' his

decision not to investigate '[i]s not a failure to exercise due diligence.'" Id. (quoting Wilson,

426 F.3d at 661, 662.)  In sum, the Third Circuit concluded that "due diligence depends on each

petitioner's circumstances and the nature of the claim asserted, and it requires that we assess, in

light of that context, what a petitioner would have reasonably expected might result from

investigative efforts." Id. at 289 (internal citation omitted).

Next, the Third Circuit noted that Dennis did not involve Section 2244(d)(1)(D) directly

and did not alter that provision's requirement of due diligence. Id. at 291.  Accordingly, the

question was whether Dennis materially altered what a petitioner in Bracey's position would

have expected about improperly withheld Brady material in the prosecution's possession. Id.

The Third Circuit found that Dennis "decisively rejected the line of cases embracing a due

diligence obligation and returned us to first principles as to both the factual predicate of a Brady

claim and the reasonable expectations of a defendant in the Brady context." Id. at 289-90.  The

court noted that Dennis clarified the reasonable expectations of Brady claimants by holding that

the prosecutor's duty to disclose pursuant to Brady was "absolute." Id. at 291.  The court went

on to conclude that Dennis shifted the ground on which Bracey's habeas petition was dismissed:

> Put differently, § 2244(d)(1)(D) asks whether a "person in [the petitioner's] position would reasonably expect" that independent investigation would yield evidence of a <u>Brady</u> violation, <u>Wilson</u>, 426 F.3d at 661, and <u>Dennis</u> answers that, absent evidence to the contrary, a petitioner would reasonably expect – and, indeed, "is entitled to presume," 834 F.3d at 290 – the exact opposite: that there is no <u>Brady</u> violation to be discovered.

<u>Id</u>.  Importantly, the Third Circuit added two clarifications with respect to the scope of its holding.  First, the court clarified that

> "where the record demonstrates that the defendant or defense counsel was aware of the potential <u>Brady</u> material but failed to pursue investigation of that ultimate claim," <u>id</u>. at 910, nothing in <u>Dennis</u> or any other decision of this Circuit, including today's, stands in the way of any of the consequences that AEDPA attaches to a lack of due diligence, *see* <u>Gage v. Chappell</u>, 793 F.3d 1159, 1166 (9th Cir. 2015).  The baseline expectations that <u>Dennis</u> established for <u>Brady</u> claimants in the context of AEDPA's due diligence requirements hold true only where the petitioner **has no reasonable basis in fact to be "aware of the potential <u>Brady</u> material."**  <u>Johnson</u>, 442 F.3d at 910.

<u>Id</u>. at 294 (emphasis added).  Secondly, the court explained that Section 2244(d)(1)(D)'s due diligence requirement is highly context-specific.  <u>Id</u>.  "[A]s far as <u>Brady</u> claims go, due diligence requirements remain substantial:  If there is a reasonable basis for a petitioner to believe additional investigation will yield undisclosed <u>Brady</u> material, that petitioner must investigate or else risk the statutory consequences."  <u>Id</u>.

## C. <u>Neither *Dennis* nor *Bracey* are material to this Court's original dismissal of the Petition</u>

As noted in section B, *supra*, a court may grant equitable relief under Rule 60(b)(6) "in extraordinary circumstances where, without such relief, an extreme and unexpected hardship would occur."  <u>Cox v. Horn</u>, 757 F.3d 113, 120 (3d Cir. 2014) (citation and internal quotation marks omitted).  In <u>Cox</u>, the Third Circuit set forth a number of factors a district court should consider in answering that question, including: (1) the effect of the change in decisional law on the district court's prior ruling, (2) the merits of the petitioner's underlying claim, (3) principles

of finality and comity, (4) the petitioner's diligence in pursuing review of his claims, and, where appropriate, (5) the gravity of the petitioner's sentence.  757 F.3d at 122-26.  For the reasons that follow, the Court finds that neither <u>Dennis</u> nor <u>Bracey</u>, which form the basis upon which Vogt seeks to reopen these habeas proceedings, are material to this Court's original dismissal of his Petition and, for this reason, Rule 60(b) relief is not warranted, and the remaining factors discussed in <u>Cox</u> will not be addressed.

At the outset, the Court notes that since the initiation of these proceedings in 2008, Vogt has repeatedly represented to the Court that the identity of the male individual who accompanied Cowfer into the residence of Deiseroth and Mayhugh on the morning following Landry's murder is "<u>Brady</u> material."  However, simply labeling something as <u>Brady</u> material doesn't make it so, and over the last nearly thirteen years, Vogt has never once demonstrated to this Court that this information actually constitutes <u>Brady</u> material.  Indeed, for the information to constitute true <u>Brady</u> material, Vogt would have to show that the identity of the unknown individual who accompanied Cowfer into the residence was exculpatory or impeaching, that said information was willfully or inadvertently suppressed by the Commonwealth and that had the jury known the identity of this individual then there was a reasonable probability of a different verdict.  He has not done so.

First, the Court notes that all that Vogt has ever produced in support of his claim that it was McClearn, and not he, who was the unidentified individual who accompanied Cowfer is a letter allegedly written and signed by Cowfer, his convicted co-defendant, whose credibility has not only been called into question by Vogt himself[6] but is called into question by this Court for

---

[6] In response to why he chose to forgo calling Cowfer as a witness at the evidentiary hearing scheduled on his first PCRA petition on December 7, 1998, Vogt stated, "When I was transported to court my counsel on that action

how his story has changed over the years.  However, Cowfer's letter has never been authenticated and is signed "Walter S. Cowfer" and not "Walter S. Cowfer, Jr." as had appeared in the letters addressed to Vogt's trial counsel from 1991 and 1997.  Nevertheless, even assuming the truthfulness of such information provided by Cowfer, Vogt has never demonstrated that the Commonwealth ever knew or could have known of the identity of the unknown male individual who accompanied Cowfer into the residence, and, in fact, the evidence that was introduced at trial indicates that it is highly unlikely that they ever did know of such information as both Deiseroth and Mayhugh testified that neither of them knew the name of the individual and neither were asked while on the stand whether they could identify the individual as either Vogt, Sopo or McClearn.  Thus, common sense would suggest that neither the police nor the Commonwealth ever learned of the identity of this individual, at least as it could have come from Deiseroth and Mayhugh, and the only individuals who actually did know were those who were present at the residence that morning, including Cowfer, Sopo, McClearn and Vogt himself.[7] However, during his testimony, Sopo did not admit to stopping at the residence, and, to the extent one can speculate that the Commonwealth may have learned of the identity of this individual through McClearn, counsel for Vogt could have but did not question McClearn about the stop at the residence or who went inside with Cowfer when cross-examining him at trial.[8]

---

showed me a different statement he had made when he was trying to wriggle out of responsibility, which drastically conflicted with the gist of what he's sent me.  Because I realized he lacked credibility and so not to waste the time of the court I withdrew the petition."  (ECF No. 57, p.3, n.3.)

[7] It is not clear whether Zawodniak was waiting outside in the car or not.  McClearn testified that the group dropped her off at home before they went to Deiseroth and Mayhugh's residence, and Deiseroth testified to seeing only two people waiting in the car outside.  However, Cowfer stated in his letter dated September 23, 2004 that Zawodniak was waiting in the car with Vogt and Sopo.

[8] The prosecutor also did not question McClearn about who it was that went inside with Cowfer, nor did he question Deiseroth or Mayhugh about whether they recognized Vogt as being the individual who accompanied Cowfer inside that morning.

This is most likely because such information was irrelevant, or, in other words, not "material" as to Vogt's involvement in Landry's death.[9]   Simply put, Vogt has not shown that the identity of this individual was ever known, or should have been known, by the Commonwealth, and to the extent that Vogt would like to think of such information as "material," **even though it was not**, then the Third Circuit made clear in <u>Bracey</u> that, in this situation, he had a duty to exercise due diligence in investigating this information for purposes of AEDPA's § 2244(d)(1)(D) because since the beginning of his criminal case, or, at least since his trial, Vogt had a reasonable basis to believe that the identity of this individual was important.  Vogt clearly had at least two opportunities to investigate.  His counsel could have questioned McClearn, Deiseroth or Mayhugh about the identity of said individual at trial and Vogt himself could have questioned Cowfer about the identity of said individual at the scheduled hearing on his first PCRA petition on December 7, 1998.  He did neither, and he cannot now claim that he is entitled to Rule 60(b) relief simply by labeling the information as "<u>Brady</u> material" and claiming that, pursuant to <u>Dennis</u> and <u>Bracey</u>, he did not have a duty to exercise such due diligence.[10]   The fact is that this is not <u>Brady</u> material and therefore nothing in <u>Dennis</u> or <u>Bracey</u> is materially applicable to this Court's original dismissal of Vogt's Petition.

In sum, Vogt provides no cause to disturb this Court's dismissal of his Petition as time-barred, and, for the record, the Court would note that even if Vogt's four habeas claims were not

---

[9] Vogt has failed to show how the outcome of his trial would have been different had the jury actually known who it was that accompanied Cowfer into the residence of Deiseroth and Mayhugh.  Even if it was McClearn, said information is by no means exculpatory as to Vogt's involvement in Landry's death.  Whether Vogt was with Cowfer inside the residence or with the other(s) in the car, is of no importance since both Deiseroth and Mayhugh testified that it was *Cowfer* who incriminated himself and admitted to killing Landry.

[10] Vogt makes much ado of the fact that his trial counsel uses the terms "exculpatory" and "<u>Brady</u>" at the sidebar during Deiseroth's testimony.  However, these terms were used in connection with whether Deiseroth had given a written statement to police that had not been turned over to the defense, not in the context of whether the Commonwealth had evidence of the identity of the individual with Cowfer.

denied as untimely, or pursuant to some other procedural bar, they would have otherwise been denied as without merit.

**IV.      <u>Certificate of Appealability</u>**

A certificate of appealability is required to appeal from the denial of a Rule 60(b) motion. *See* <u>Bracey</u>, 986 F.3d at 283 (reaffirming <u>Morris v. Horn</u>, 187 F.3d 333 (3d Cir. 1999), and holding that a certificate of appealability is required to hear an appeal from the denial of a Rule 60(b) motion).  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue . . . if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Vogt has not made the requisite showing in this case. Accordingly, a certificate of appealability will be denied.  A separate Order follows.

Dated: October 29, 2021.


/s/ Lisa Pupo Lenihan
Lisa Pupo Lenihan
United States Magistrate Judge


cc:  Steven David Vogt
     BN-3436
     SCI Fayette
     50 Overlook Drive
     LaBelle, PA  15450

     Counsel for Respondent
     (Via CM/ECF electronic mail)

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEVEN DAVID VOGT, | ) | |
| | ) | Civil Action No. 08 - 530 |
| Petitioner, | ) | |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| v. | ) | |
| | ) | |
| SUPERINTENDENT COLEMAN, | ) | ECF Nos. 56, 57, 76, 77 & 81 |
| | ) | |
| Respondent. | ) | |

**ORDER**

**AND NOW**, this 29th day of October, 2021,

**IT IS HEREBY ORDERED** that Petitioner's Motion for Relief from Judgment pursuant to Federal Rule of Civil Procedure 60(b) (ECF Nos. 56, 57) is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner's Motion for an Evidentiary Hearing (ECF No. 76), Motion to Appoint Counsel (ECF No. 77), and Motion for Corrective Instruction and Sanctions (ECF No. 81) are also **DENIED**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **DENIED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Petitioner has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

/s/ Lisa Pupo Lenihan

Lisa Pupo Lenihan
United States Magistrate Judge

cc:  Steven David Vogt
     BN-3436
     SCI Fayette
     Box 9999
     LaBelle, PA  15450-0999

Counsel for Respondent
(Via CM/ECF electronic mail)