**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

STEVEN DAVID VOGT,       )
                          )     Civil Action No. 08 – 530
           Petitioner,    )
                          )     Magistrate Judge Lisa Pupo Lenihan
       v.               )
                          )
SUPERINTENDENT COLEMAN,  )     ECF Nos. 95-98
                          )
          Respondent.    )

## MEMORANDUM OPINION

This case is before the Court on a Motion for Relief from Judgment filed by Petitioner, Steven David Vogt ("Vogt"), pursuant to Federal Rule of Civil Procedure 60(b) ("Rule 60(b)"). (ECF No. 98).  This is the seventh Rule 60(b) motion Vogt has filed since his federal habeas petition was dismissed as untimely on January 8, 2010.  In this motion, he argues that this Court should vacate its order dismissing his petition as untimely and review the merits of his claims because he has new, reliable evidence of his innocence.  In support of his motion, he relies on an entirely typewritten recantation letter purportedly authored by his co-defendant, Arthur McClearn.  For the following reasons, Petitioner's Rule 60(b) motion will be denied. Additionally, Vogt's habeas claims will be denied on the merits in the alternative.

A. **Relevant Factual History**

On May 12, 1990, Francis Landry ("Landry") picked up Michael Sopo ("Sopo"), Margaret Zawodniak[1] ("Zawodniak") and Steven Vogt ("Vogt") in his blue Nissan and took them to his residence in Export, Pennsylvania where, except for Landry, they drank beer.  A while later, Walter Cowfer ("Cowfer") came to Landry's residence.  Vogt, Cowfer, Sopo and

---

[1] Zawodniak passed away on March 8, 2020.

Zawodniak left and went to Arthur McClearn's[2] ("McClearn") apartment where they continued to drink and discussed a plan to murder Landry.  The parties returned to Landry's residence where they resumed drinking beer.  At some point, Cowfer went to Landry's car where Landry was sleeping and asked to take the car to Cupec's Lake.  He then ordered Landry to get in the back seat where he was surrounded by two of the others.  Once there, Landry was ordered out of the car by Cowfer, Vogt, and McClearn.  Zawodniak and Sopo stayed in the car while the others started walking down the path to the lake.  Landry complained that his chest hurt and protested going any further.  Landry was eventually pushed over a hill where he fell 30 to 40 feet into the lake.  The others threw rocks into the water and rolled a huge boulder into the water that hit Landry.  They then went back to the car, drank more beer and left the area.  The next day, Landry's drowned body was discovered by some area scuba divers.  Several days later, State Trooper Strawbridge received a call from the Monroe County Sheriff's Department in Tavernier, Florida that Sopo, Vogt and Cowfer were in custody there and in possession of the registration plate of Landry's car and his wallet.  *See* Commonwealth v. Vogt, No. 1281 PGH 1991, unpublished memorandum at 2-3 (Pa. Super. Ct. Oct. 21, 1992); *see also* (ECF No. 14-4, pp.35-36.)

Subsequently, Vogt, Cowfer, Zawodniak, Sopo and McClearn were arrested and charged with Landry's murder.  Vogt, Cowfer and Zawodniak elected to proceed to a trial by jury.  Sopo and McClearn entered guilty pleas whereby they admitted their involvement in the murder.  For his part, McClearn pled guilty to third degree murder, robbery, theft by unlawful taking, kidnapping and criminal conspiracy, and in exchange, received a sentence of four to eight years of imprisonment. Sopo pled guilty to criminal conspiracy.  Both men testified on behalf of the

---

[2] McClearn passed away on January 14, 2017.

Commonwealth at the trial of Vogt, Cowfer and Zawodniak, which commenced before a jury on

January 29, 1991.  At the conclusion of the trial, Cowfer and Vogt were convicted of first-degree

murder, robbery, theft by unlawful taking, kidnapping and criminal conspiracy.  Zawodniak was

acquitted of all charges.  Following the denial of post-verdict motions, on June 17, 1991, Vogt

was sentenced to life imprisonment for the murder conviction.

Relevant to Vogt's current motion is the testimony of McClearn.  McClearn testified at

trial and recounted the events that led up to their arrival at Cupec's Lake.  See ECF No. 72-2,

pp.38-40.  McClearn told the jury that he, Vogt, Cowfer and Landry got out of the car and

walked into the woods.  Id., p.40.  Vogt and Cowfer instructed McClearn to just follow the path

as it led to the lake.  Id.  McClearn then testified as follows:

> Mr. Landry was complaining about his chest hurting.  So we stopped for a few
> seconds.  He said he didn't want to go any more.  Steve [Vogt] said, I'll help him.
> He took him by his arm and his elbow and was helping him walk.  He stopped
> again.  He said his chest was hurting him bad, he didn't want to go any further.
> We stopped.  I turned around.  Walt [Cowfer] said, here, he threw me a wallet and
> he told me to see if there was any money in it.

Id., pp.40-41.  McClearn testified that he opened the wallet, which belonged to Landry,

determined it was empty and threw it back to Cowfer.  Id., p.41.  He testified that as he turned

around to walk away, he heard Landry yell.  Id.  When he turned around, he saw Landry going

over the hill into the lake.  Id.  According to McClearn, Landry was yelling, "Don't do me, I'll

give you $5,000.00," then after a little while he yelled, "Don't do me, I'll give you $10,000."

Id., pp.41-42.  McClearn testified that he walked away to another spot in the woods and stayed

there for an hour or longer.  Id., p.42.  He could hear rocks hitting the water and heard Landry

yell a few times more before he didn't hear him anymore.  Id.  He stated that he turned around to

walk back and saw Landry over the hill in the water.  Id.  He also stated, "Every once in a while

you could see his feet, you could see ripples come out into the water."  Id.  He testified that Vogt

asked him to help him get a rock, and he helped him set a rock up on the bank that eventually went down over the hill.  Id.  When McClearn started to leave, Cowfer asked him to get a rope, which he did.  Id.  He then saw Vogt go down over the hill to where Landry was and then saw Landry pushed out from the shore.  Id.  He testified that Landry tried to tread water but "went under," and then he turned around and went back to the car.  Id.  He stated that once he returned to the car, Vogt and Cowfer emerged from the woods and the group hung around for a few minutes drinking beer.  Id., p.43.  Sopo asked where Landry was and someone said "Frank's swimming."  Id.  He testified that Zawodniak was asleep in the back seat, then everyone got in the car and they left.  Id.  When asked where they went, McClearn testified as follows:

> Someplace around New Kensington or Tarentum, first.  We dropped Maggie [Zawodniak] off.  From there we went a little farther.  I'm not sure how far it was.  We stopped at another guy's house, bought $10.00 worth of marijuana . . .  We left the man's house.  We went back to Export.  We got to my house, first, went in and got clothes.  From my house we went to Walt's [Cowfer].  Walt [Cowfer] went in his house and got a jacket, clothes, shoes.  I don't know what else he got.

Id.

During cross-examination by Vogt's attorney that spanned 86 pages of the trial transcript, McClearn agreed that he plead guilty to criminal charges even though he was not guilty of committing them because he wanted to obtain a good deal for himself.  Id., pp.49-51.  McClearn stated that he was guilty "just for being there."  Id., p.52.  The following exchange then occurred:

> Q:    Can you tell me whether or not at the time that you entered into this plea agreement if you were told by the District Attorney's Office or by your attorney that in fact you might be facing the death penalty?
>
> A:    They told me I might be facing the death penalty.
>
> Q:    Was that one of the reasons you agreed to plead guilty to these things that you now say you didn't do?
>
> A:    Yes, it was.

4

Id., p.53.  Counsel then reviewed all of the maximum sentences associated with the crimes to which McClearn pled guilty, pointing out that McClearn only received a sentence of four to eight years in light of the plea agreement.  Id., pp.53-54.  McClearn was then questioned about all of the alcohol he consumed on May 12, 1990, as well as his ingestion of Percocets and marijuana. Id., pp.55-59, 66.

As far as his relationship with Cowfer, McClearn testified that he had known Cowfer approximately one and one-half months prior to Landry's murder and agreed that their acquaintance basically centered around drinking.  Id., pp.59-60.  With respect to Vogt, McClearn stated that he had never met Vogt prior to the evening in question.  Id., p.61.  During cross-examination, McClearn was questioned about inconsistencies between his statements to police, his preliminary hearing testimony, and his trial testimony.  Id., pp.81-83, 90-93, 104-07, 110-13. The following exchange occurred at the end of the cross-examination by Vogt's attorney:

> Q:    Then is it also the truth that you in fact did commit murder?
>
> A:    No, it's not.
>
> Q:    That you did in fact kidnap somebody?
>
> A:    No.
>
> Q:    You made a deal to help yourself, right?
>
> A:    Yes.

Id., p.134.

### B.  Applicable Law

Vogt requests relief pursuant to Federal Rule of Civil Procedure 60(b).  Federal Rule of Civil Procedure 60(b) allows a party to seek relief from a final judgment, and request reopening of his case, under a limited set of circumstances, including (1) mistake, inadvertence, surprise, or

excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial; (3) fraud or misconduct by an opposing party; (4) because the judgment is void; (5) because the judgment has been satisfied, released or discharged; and (6) any other reason that justifies relief.  Fed. R. Civ. P. 60(b).  Vogt specifically invokes Rule 60(b)(6).

"Rule 60(b)(6) is a catch-all provision that authorizes [the] court to grant relief from a final judgment for 'any . . . reason' other than those listed elsewhere in [Rule 60(b)]."  Cox v. Horn, 757 F.3d 113, 120 (3d Cir. 2014) (quoting Fed. R. Civ. P. 60(b)(6)).  Rule 60(b)(6) "provides 'a grand reservoir of equitable power to do justice in a particular case.'"  Id. at 122 (quoting Hall v. Cmty. Mental Health Ctr., 772 F.2d 42, 46 (3d Cir. 1985)).  "The grant or denial of a Rule 60(b)(6) motion is an equitable matter left . . . to the discretion of [the] district court."  Id. at 124.  The court is, however, "to dispense [its] broad powers under [Rule] 60(b)(6) only in 'extraordinary circumstances where, without such relief, an extreme and unexpected hardship would occur.'"  Id. at 120 (quoting Sawka v. Healtheast, Inc., 989 F.2d 138, 140 (3d Cir. 1993)).  "[The] movant . . . bears the burden of establishing entitlement to [Rule 60(b)(6)] equitable relief . . . ."  Id. at 122 (citing Mayberry v. Maroney, 558 F.2d 1159, 1163 (3d Cir. 1977)).

Vogt argues that McClearn's recantation letter, and the change in the law brought about by McQuiggin v. Perkins, 569 U.S. 383, 392 (2013), is an extraordinary circumstance that entitles him to Rule 60(b)(6) relief.   In McQuiggin, the United States Supreme Court recognized that the actual innocence gateway to federal habeas review for procedurally defaulted claims in Schlup v. Delo, 513 U.S. 298 (1995) extends to cases where a petitioner's claims would otherwise be barred by the expiration of AEDPA's one-year statute of limitations.  569 U.S. at 386.  In other words, McQuiggin allows a petitioner who makes a credible showing of actual

innocence to pursue his or her constitutional claims even in spite of the statute of limitations bar.

Four years after the Supreme Court issued <u>McQuiggin</u>, the Court of Appeals for the Third Circuit

addressed whether the change brought about by <u>McQuiggin</u> was an extraordinary circumstance

upon which Rule 60(b)(6) relief may issue.  In <u>Satterfield v. District Attorney Philadelphia</u>, 872

F.3d 152 (3d Cir. 2017), the Third Circuit held that "a proper demonstration of actual innocence

by [a habeas petitioner] should permit Rule 60(b)(6) relief unless the totality of equitable

circumstances ultimately weigh heavily in the other direction.  A contrary conclusion would

leave open the possibility of preventing a petitioner who can make a credible showing of actual

innocence from utilizing the fundamental-miscarriage-of-justice exception simply because we

had not yet accepted its applicability at the time his petition was decided – an outcome that

would plainly betray the principles upon which the exception was built."  <u>Id</u>. at 163.  Therefore,

"if a petitioner can make a showing of actual innocence, <u>McQuiggin</u>'s change in law is almost

certainly an exceptional circumstance."  <u>Id</u>.

   "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in

light of new evidence, 'it is more likely than not that no reasonable juror would have found

petitioner guilty beyond a reasonable doubt.'"  <u>House v. Bell</u>, 547 U.S. 518, 537-38 (2006)

(quoting <u>Schlup</u>, 513 U.S. at 327).

> It is not the district court's independent judgment as to whether reasonable doubt
> exists that the standard addresses; rather the standard requires the district court to
> make a probabilistic determination about what reasonable, properly instructed
> jurors would do.  Thus, a petitioner does not meet the threshold requirement
> unless he persuades the district court that, in light of the new evidence, no juror,
> acting reasonably, would have voted to find him guilty beyond a reasonable
> doubt.

<u>Schlup</u>, 513 U.S. at 329.

Removing the double negative, a petitioner's burden at the gateway stage is to demonstrate "that more likely than not any reasonable juror would have reasonable doubt." House, 547 U.S. at 538.  As this formulation makes clear, "actual innocence" is something of a misnomer, because "the Schlup standard does not require absolute certainty about the petitioner's guilt or innocence" – that is, a petitioner need not make "a conclusive exoneration." Id. at 538, 553; see also Schlup, 513 U.S. at 327 ("[T]he showing of 'more likely than not' imposes a lower burden of proof than the 'clear and convincing' standard.").  Thus, a "petitioner's showing of innocence is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict."  Id. at 331; see House, 547 U.S. at 553-54 (granting a gateway innocence claim despite acknowledging that "[s]ome aspects of the State's evidence . . . still support an inference of guilt"); Cleveland v. Bradshaw, 693 F.3d 626, 633 (6th Cir. 2012) (noting that the actual innocence standard "is less strict than the insufficient evidence standard").

Nevertheless, the Supreme Court has stressed that the Schlup standard is "demanding," McQuiggin, 569 U.S. at 401, and "that tenable actual-innocence gateway pleas are rare," id. at 386, arising only "in an extraordinary case," Murray v. Carrier, 477 U.S. 478, 496 (1986).  "The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'"  McQuiggin, 569 U.S. at 401 (quoting Schlup, 513 U.S. at 316).  The actual innocence standard is designed to "ensure[] that petitioner's case is truly 'extraordinary' while still providing [a] petitioner a meaningful avenue by which to avoid a manifest injustice."  Schlup, 513 U.S. at 327 (quoting McCleskey v. Zant, 499 U.S. 467, 494 (1991)).

To be credible, a claim of actual innocence requires a petitioner to present "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."  Schlup, 513 U.S. at 324.  In assessing the adequacy of a petitioner's showing, "the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial,'" House, 547 U.S. at 538 (quoting Schlup, 513 U.S. at 327-28).  Put another way, the innocence inquiry "requires a holistic judgment about 'all the evidence,' and its likely effect on reasonable jurors applying the reasonable-doubt standard." Id. at 539 (quoting Schlup, 513 U.S. at 328).

**C.  Discussion**

**1.  The McClearn letter and Vogt's proceedings on his fifth PCRA petition.**

As previously stated, Vogt's Rule 60(b) motion is premised on an entirely typewritten letter from his co-defendant, Arthur McClearn, that is dated October 23, 2016.  In its entirety, the letter provides:

October 23, 2016

Mr. Vogt,

They say I gotta go back and make amends for past wrongs before I can put the past completely behind me.  Hope they are right and this helps ease my conscience.  I checked online and found you.  Saw your appeal or something.  I wish that would have worked for you so I don't have to do this.  It's me Art McClearn Please keep reading this, because if I can help I will.  You will never know how sorry I am that things worked out the way they did.  I don' know what you did to piss those people off but they made me testify the way I did.  I did tell them the truth but they wouldn't accept it and kept at me until they liked what I said.  I didn't know you, so it was easier to go through with it, but you have to understand!  It was to save my life!  They made me help convict you.  It was the only way to avoid the death penalty.  It says online that you don't remember much.  I'm not surprised you were really wasted.  The fact is you did not go to the quarry where me and Sherm killed Frank.  You were passed out in the car.  Then when we came back you were laying on the ground outside the car.  Sherm wanted to leave you there, said he wasn't babysitting.  I helped you get up and put you back in the car.  Can't believe Sherm did that.  Do you know he talked about

going to the police and telling them you killed Frank right away?  He didn't think they'd believe it then.  I think he may have called them from his friend's or somewhere.  Maybe that's why they were so focused on you to blame.  I don't know.  I lied when I said you had anything to do with killing Frank.  You did not. I'm ready to tell the truth.  I need to tell the truth.  I know you may be mad and I wouldn't blame you, but I'm really trying to make it right, now.  I'm sorry it has taken so long.

I don't feel comfortable giving you my house address there so you'll have to have your lawyer contact me on Facebook if you think I could help with an appeal.  I'm willing to testify to the truth now.  I really am sorry, Steve!

Art

(ECF No. 98-1, p.3.)

Vogt maintains that he received McClearn's letter in an interdepartmental mail envelope that was delivered to his cell on May 17, 2017, over six months after the letter is dated. According to a civil lawsuit Vogt filed, *see* FN 3, McClearn's letter was rejected in compliance with the prison's mail policy because it lacked a return address, but he was never notified of the rejection.  In April 2017, Vogt contacted a United States Postal Service reclamation center looking for a different mailing.  In response, the Post Office returned several items, one of which was McClearn's letter that was postmarked October 25, 2016, but by that time McClearn had been dead for about five months.

In June 2017, shortly after receiving McClearn's letter, Vogt filed a fifth PCRA petition arguing that the letter entitled him to a new trial.  The PCRA court dismissed the petition as untimely on June 23, 2017, concluding that it was not filed within 60 days of the date on the letter and that the unsworn letter was not sufficient to repudiate McClearn's sworn trial testimony.  On appeal, the Pennsylvania Superior Court vacated the order and remanded for

consideration of the timeliness of the petition.  *See* <u>Commonwealth v. Vogt</u>, 2018 WL 1516372

(Pa. Super. Mar. 28, 2018).[3]

Vogt was appointed counsel on October 3, 2018, and counsel filed an amended PCRA

petition on his behalf on January 7, 2019.  The following is a summary of the proceedings

following counsel's filing of the amended petition.

> . . . . In the Amended petition, [Vogt]'s prior filings were incorporated, including
> the October 23, 2016 typewritten letter purportedly authored by Arthur
> [McClearn].  Also incorporated was a July 24, 2017 handwritten letter from
> Heidru Maureschat ("Maureschat") which stated that she sent a letter to Appellant
> in November 2016 that contained photographs.  Maureschat Letter, 7/24/17,
> attached as Exhibit C to Appellant's Amended Fifth PCRA Petition.  "Thinking
> about it later," she realized that she may have forgotten to put her return address
> on the envelope.  <u>Id</u>.  She then wrote that in January 2017, she asked [Vogt] if he
> ever received the photographs and he responded that he did not.  Although he was
> supposedly notified by Maureschat in January 2017 that there was a problem with
> his mail, [Vogt] did not make inquiry about the status of his mail with the prison
> until April 17, 2017.  See Exhibit D attached to Appellant's Amended Fifth
> PCRA Petition.
>
> As the amended PCRA petition also incorporated [Vogt]'s brief on the timeliness
> of his petition, an April 2, 2018 statement from Phyllis Vogt, [Vogt]'s mother,
> was included, providing as follows:
>
>> I cannot recall an exact date, but sometime around 2005 my son
>> [Vogt] requested that I try to find Arthur McClearn.  [Vogt]
>> wanted some information concerning an appeal he was planning to
>> file.  It was something that would not have negatively impacted
>> [Arthur McClearn] or his credibility.  I found the address on the
>> internet and went to visit [Arthur McClearn].  He came to the door

---

[3] While his appeal from the dismissal of his fifth PCRA petition was pending before the Superior Court, Vogt filed a
civil action in this Court against the Secretary of the Department of Corrections and the mailroom employees at SCI-
Fayette wherein he alleged that his due process rights and his right to access the courts were violated when his letter
from McClearn was rejected by the prison officials without notice to him in October 2016.  *See* <u>Vogt v. Wetzel</u>, No.
17-cv-01407 (W.D. Pa. 2017).  This Court ultimately dismissed his complaint for failure to state a claim.  <u>Id</u>., 2018
WL 3388484 (W.D. Pa. July 12, 2018).  On appeal, the Third Circuit Court of Appeals vacated the order dismissing
Vogt's procedural due process claim and directed this Court to address it at summary judgment or trial, as
appropriate.  The Third Circuit also vacated the order dismissing Vogt's access to the courts claim as unripe with
instructions to stay that claim while his PCRA litigation proceeded.  *See* <u>Vogt v. Wetzel</u>, 8 F.4th 182, 187 (3d Cir.
2021).  On remand, the parties filed motions for summary judgment, to which the Court granted Vogt's motion only
as to the Secretary's liability for a violation of Vogt's due process rights.  The Court then granted a stay of the action
pending resolution of Vogt's PCRA litigation and "any related federal habeas litigation."  *See* <u>Vogt v. Wetzel</u>, No.
17-cv-01407, ECF No. 101 (W.D. Pa. Aug. 23, 2022).  It is necessary to point out that the authentication of
McClearn's letter was not and is not an issue in Vogt's civil suit.

and, on learning my identity, was totally uncooperative and indicated by word and demeanor that he wanted nothing to do with me or [Vogt]. So I left. [Vogt] asked me at a later time if I could try to contact [Arthur McClearn] again. But I couldn't find his address then and felt it would be useless anyway based on his earlier responses.

Mrs. Vogt's Letter, 4/2/18. [Vogt]'s father, William Vogt, also submitted a statement, indicating that he drove his wife [Vogt]'s mother)] to Arthur [McClearn]'s residence and waited in the vehicle. Mr. Vogt's Letter, 4/2/18. Mr. Vogt stated that "I saw [Arthur McClearn] come to the door. He and [Mrs. Vogt] exchanged words very briefly and then he went inside and closed the door. When she came back to the car, [Mrs. Vogt] was disappointed that [Arthur McClearn] refused to talk to her." Id.

On August 26, 2019, the PCRA court conducted a hearing on [Vogt]'s Amended Fifth PCRA Petition, following which it determined the petition to be timely filed. On March 8, 2021, the PCRA court held a hearing on the merits of the petition. Although [Vogt]'s parents were present, [Vogt] did not call them to the stand to testify on his behalf. See N.T., Hearing, 3/8/21, at 3.

* * *

[At the hearing, Vogt] . . . presented the testimony of Judson McClearn, Jr. ("J. McClearn"), the first cousin of Arthur [McClearn]. Through introduction of Arthur [McClearn]'s death certificate, it was established that Arthur [McClearn] died on January 14, 2017. According to J. McClearn, while Arthur [McClearn] was incarcerated for the murder, he would send J. McClearn typewritten letters. J. McClearn was quick to add that Arthur [McClearn] would always write just "Art" on the bottom.

> Q: Okay. Did he actually sign it in like a pen, or was it just a typed signature?
>
> A: I believe it was pen.
>
> Q: You think he wrote to you in pen?
>
> A: No. No. He typed it, but it seemed to me like it looked bigger from what I can remember.
>
> Q: Are you actually – are you certain that's how it was?
>
> A: I'm actually not certain, to tell you the truth. I – you know, it – I do believe it was typed actually now – now that I'm recollecting it. It was many years ago, I believe it was just typed, all typed.

J. McClearn characterized his relationship with Arthur [McClearn] as estranged following Arthur [McClearn]'s release from prison.

> Q:  Okay.  When he was released from prison, did you still have communications with him in that format [typed]?
>
> A:  Yeah – writing?
>
> Q:  Uh-huh.
>
> A:  No, I actually spoke with him a couple times, but not face to face.
>
> Q:  Okay.  Would you say your relationship to Art was close or estranged? How would you describe it?
>
> A:  I would say estranged.  But we also – I mean we wrote because – my family really just kind of disowned him, but he's still my cousin no matter what happened.
>
> Q:  Okay.  And how often would you say that you received letters from Art in the typed fashion?
>
> A:  Two, three times a month.

J. McClearn, however, could not locate any of these letters for purposes of the hearing.  According to J. McClearn, a woman reached out to him and asked if he had any knowledge of Arthur [McClearn] sending a letter to a prison.  J. McClearn testified that "Art[hur] did tell me that, that he had – he wanted to get reprieve and tell the truth about [Vogt]."  When asked when he was made aware of this letter, J. McClearn stated he "really can't remember" and "believe(d) it was after Art[hur] passed."  J. McClearn testified that he stopped receiving letters from Arthur [McClearn] in 2013 or 2014 "because he had moved closer to us and stuff like that.  So we started talking on the phone more."  J. McClearn, however, testified that he did not know the town where Arthur [McClearn] lived.  He stated that he only saw Arthur [McClearn] twice after Arthur was released from prison.

When asked where Arthur [McClearn] was living in 2016, J. McClearn initially did not recall but then stated that Arthur was in a nursing home at the time.  However, J. McClearn did not know the location of the nursing home.  Although he previously testified that he stopped receiving letters from Arthur [McClearn] in 2013 or 2014, he later testified that Arthur told him about the letter to [Vogt] in a letter that he (Arthur) sent to J. McClearn in 2015.  He also told the court that he "believed" that Arthur [McClearn] sent him letters from the nursing home.  Although he claimed to have received these letters, he stated that he never saw Arthur [McClearn]'s signature.  J. McClearn neither attended Arthur

[McClearn]'s funeral, nor did he receive any of his belongings.  The following exchange then occurred with respect to whether J. McClearn ever provided any written statements.

> Q:  There was a certification that was filed in this matter by [Vogt's] attorney wherein she indicated that she attempted to contact you on several occasions to obtain a certification from you, but the efforts were unsuccessful.  How did anyone reach out to you with respect to [Vogt's] defense?
>
> A:  The only person that's ever reached out to me was the Mary lady and her.
>
> Q:  And how did [Vogt's counsel] reach out to you?
>
> A:  Via phone.  Or Facebook I do believe.
>
> Q:  All right.  Did you write out a statement?
>
> A:  I believe I did.
>
> Q:  Who did you give that statement to?
>
> A:  I – maybe I – maybe I didn't write out a statement.  I thought I wrote something down or something with [Vogt's counsel], but maybe I didn't write down a statement.

Finally, [Vogt] testified on his own behalf.  He stated that he discovered Arthur [McClearn]'s letter on May 17, 2017 when an inter-department mail envelope was placed in his cell.  [Vogt] testified that he had written to mail recovery centers looking for lost mail after he failed to receive a letter and photographs sent to him by his friend, Maureschat.  He claimed that the envelope that contained Arthur [McClearn]'s letter was confiscated during a search of his cell.

[Vogt] identified Exhibit "H" as his sworn affidavit dated April 3, 2018 wherein he stated, in relevant part, that he had tried to contact Arthur [McClearn] "many times over more than two decades through various family members and friends" and that "occasionally people declined to help, but when he was actually contacted he refused to speak on the matter, and typically quite rudely."  He further averred in his affidavit that "prior to receiving the recantation letter I did not know [Arthur McClearn's] whereabouts and had no reason to believe he had a change of heart since my last attempts pertaining his willingness to speak with me or anyone else on the matter."

When asked if he recalled the events leading up to the murder, [Vogt] responded "[u]m, not very much reliable."  This exchange followed.

> Q:  Okay. And you've had a chance to review both the affidavit that was
> offered and admitted from Miss Zawodniak as well as Arthur
> [McClearn]'s recantation letter?  Is that right?
>
> A:  Yes.
>
> Q:  Okay.  And from what you do remember from that night, are those
> events or are those recitations accurate?
>
> A:  Yes they are.

[Vogt] subsequently testified:

> I would like to point out that the affidavit and the letter match each other
> in content for the events of that night, and they are certainly more accurate
> with my recollection of what happened compared to what was testified to
> at trial.

When asked whether anything in Arthur [McClearn]'s letter stood out to him to
cause him to believe that Arthur had personal knowledge of the information
contained within the letter, [Vogt] responded, "Yes.  One of the things I noticed
was that the author knew that [Arthur McClearn] did not know me prior to that.  I
don't think that is public knowledge anywhere.  I'm not sure of that."  [Vogt] then
added:  "Another thing is [Arthur McClearn] had referred to Walter Cowfer as
Sherm.  Only close friends of him referred to him as that."  [Vogt] thereafter
identified a photocopy of an envelope with his name, address and the words
"Legal mail" handwritten on the front of it that he claimed contained Arthur
[McClearn]'s letter.  The envelope contained no return address.

Near the conclusion of his testimony on direct examination, [Vogt] stated that
with respect to Arthur [McClearn]'s trial testimony, "I suspected [Arthur] was
lying, which is why I kept trying to contact him, but he would never respond to
it."

On cross-examination, [Vogt] acknowledged that he typed the letter to the Mail
Recovery Center and his April 3, 2018 affidavit on a word processor located in
the library at the prison.  He stated that all inmates can utilize the word processor.
When asked about the averments in the affidavit with respect to attempts made to
contact Arthur [McClearn], Vogt testified that "nobody ever gave me his
address."  He acknowledged that his mother had visited Arthur [McClearn] on
one occasion to speak with him and that he believed Holfelder (Meade) might
have contacted him.  He noted that "just a bunch of people over the years" had
tried to reach Arthur [McClearn].

Q: Those individuals that did make contact with [Arthur McClearn], how did they contact him?  Was it in person?  Was it by telephone?

A:  I believe my mother visited him.  Other people, I don't know.

Q:  They didn't explain to you how they located him?

A:  No.  A lot of them never even said they got with him at all.  They tried to find his address and couldn't.

Q:  But your mother found it?  She found his address?

A:  Yes.

Q:  How did she find his address?

A:  She did not tell me that?

Q:  You didn't ask her?

A:  No.

             . . . .

Q:  Why were you attempting to contact him for two decades?

A:  Because I believe he was lying at my trial.

Q:  And what happened when your mother actually spoke with him?

A:  I'm not sure, but he was not cooperative.

Q:  Well, you've been trying to reach him for two decades.  Didn't you ask her some follow-up questions such as where is he living?  Who is he living with?  What did he say about my case?

A:  I did not.  I did not.  If he doesn't want to talk or – if he doesn't want to talk about it, I can't make him, you know.  I wasn't trying to force myself on him.  If he wanted to talk, I wanted to hear it, but –

Q:  So you weren't interested in knowing where he lived?

A:  No.

[Vogt] stated that his mother visits him at the prison "once every couple months or so."  He was then asked whether he recalled a visit to the prison that she made

16

on July 10, 2017 shortly after the discovery of Arthur [McClearn]'s letter and the filing of his fifth PCRA petition.  He stated that he did not recall that visit specially and did not know whether he told her about the letter.

> Q:  You didn't tell her that you're pursuing a new appeal based on this letter that you received from Arthur [McClearn]?
>
> A:  I don't believe I did.  No.
>
> . . . .
>
> Q:  Did you ask your mother if [Arthur McClearn] was living in Pittsburgh?
>
> A:  I don't believe so.

Additionally, [Vogt] testified that his friend Dawn Bruner ("Bruner") sent him an e-mail on April 19, 2017 wherein she advised him that Arthur [McClearn] had passed away.  Although he claimed that Bruner had been trying to find Arthur [McClearn], he did not recall if he told her that his mother had actually located and met with Arthur.  [Vogt] could not explain how or where his friends and family searched for Arthur [McClearn].

Although he testified that the Zawodniak affidavit and Arthur [McClearn]'s letter were "certainly more accurate with my recollection of what happened compared to what was testified to at trial," [Vogt] stated on cross-examination that he did not remember anything "beyond leaving Arthur McClearn's residence" and that the next thing he remembered was "being in a motel in Kentucky."

> Q:  [S]o it's your testimony that you have no recollection of what happened at the quarry?
>
> A:  Yes.
>
> Q:  And you indicated that you always thought [Arthur McClearn] was lying?  Correct?
>
> A:  Yes.
>
> Q:  But you have no recollection of what actually happened?  Correct?
>
> A:  Correct.
>
> Q:  So why would you believe he would be lying?

A:  Because it's just not in my nature to do what he was saying I did.  But beyond that, earlier that night I hurt my ankle like really bad.  My foot was swollen and I couldn't get a shoe on because I couldn't walk due to intoxication.  It didn't seem likely that after that I would be doing what he testified to at trial.

Q:  But that – it doesn't seem likely?  Correct?

A:  Yeah.

Q:  But you don't know because you don't remember?

A:  That's true.

Commonwealth v. Vogt, 2023 WL 3736814, at *8-13 (Pa. Super. May 31, 2023) (internal citations and footnotes omitted).

Ultimately, on September 29, 2021, the PCRA court denied Vogt's fifth PCRA petition after concluding that the alleged recantation letter from McClearn was inadmissible because Vogt failed to properly authenticate it.  Specifically, the PCRA court explained:

There is not any direct proof to authenticate that the document at issue was written by Arthur [McClearn].  First, the one-page letter [Vogt] alleges he received is typewritten, including the signature.  Second, there is not a return address on the envelope the letter allegedly was in to indicate where it was sent from.  Moreover, the original envelope is not available for inspection, and only a photocopy was produced.

The [c]ourt further finds the circumstantial evidence presented is not sufficient to authenticate the typewritten letter.  [J. McClearn's] testimony regarding the format of the signature on the letters he received from Arthur [McClearn] was conflicting, as he initially stated the signature was in pen, and then stated it was typed, and then said he was not certain, before settling on that it was typed as his answer.  Further, [J. McClearn] stated he received a letter in 2015 from Arthur [McClearn] that referenced Arthur [McClearn] had sent a letter to a prison.  However, the envelope from the letter [Vogt] allegedly received was postmarked October 25, 2016.  Moreover, [J. McClearn] testified he had stopped receiving letters from Arthur [McClearn] in 2013 or 2014.  For these reasons, the [c]ourt finds that the testimony of [J. McClearn] is too indeterminate to support authentication of the document at issue.  Additionally, [Vogt's] testimony about statements in the letter that he did not believe were public knowledge are inadequate to indicate the trustworthiness of the letter.

Commonwealth v. Vogt, No. 1186 WDA 2021, 2023 WL 3736814, at *17 (Pa. Super. May 31, 2023) (citing PCRA Court Opinion, 9/29/21, at 10 (record citations omitted)).  The Superior Court affirmed the denial of the fifth PCRA petition on May 31, 2023, and, in relevant part, that court stated:

> We agree with the PCRA court's foregoing findings, which fully are supported by the record. Instantly, as outlined earlier, J. McClearn's testimony in support of [Vogt]'s effort to authenticate the letter was insufficient as it was inconsistent and incredible. J. McClearn described his relationship with Arthur [McClearn] as estranged, speaking with Arthur a couple of times, never face-to-face, after Arthur's release from prison. J. McClearn then seemingly contradicted himself on cross-examination, stating that he saw Arthur [McClearn] twice upon Arthur's release from prison. J. McClearn did not know where Arthur resided. He believed Arthur was in a nursing home in 2016, but did not know where or for how long. Additionally, J. McClearn did not attend Arthur [McClearn]'s funeral or receive any of his possessions. Yet, despite their limited contact, J. McClearn claimed that Arthur [McClearn] would send him typewritten letters two to three times per month until 2013 or 2014, following his release from prison. J. McClearn further claimed that the letters stopped because Arthur [McClearn] had moved closer to family, but their communication resumed telephonically. Once again contradicting himself, J. McClearn claimed that he specifically remembered that Arthur [McClearn] told him about the October 23, 2016 letter to [Vogt] in a letter that Arthur [McClearn] had sent to J. McClearn in 2015. The contradiction continued, when J. McClearn stated that he believed Arthur [McClearn] sent him letters from the nursing home.
>
> Despite J. McClearn's claim that he received letters from Arthur [McClearn], he never observed Arthur's signature. According to J. McClearn, Arthur [McClearn] only sent typewritten, and unsigned, letters until 2016 when he was in a nursing home. Tellingly, even though J. McClearn specifically and clearly recalled certain dates and years in question, he was unable to recall whether he himself had provided a written statement prior to the 2021 evidentiary hearing.
>
> Next, [Vogt]'s own testimony to authenticate the letter did not fare any better. When asked whether anything in Arthur [McClearn]'s letter stood out to him to cause him to believe that Arthur had personal knowledge of the information contained within the letter, [Vogt] responded, "Yes. One of the things I noticed was that the author knew that [Arthur] did not know me prior to that. I don't think that is public knowledge anywhere. I'm not sure of that." [Vogt] continued stating, "[a]nother thing is he had referred to Walter Cowfer as Sherm. Only close friends of him referred to him as that." [Vogt] completely ignored the fact that Arthur [McClearn] testified at trial that he had known Cowfer for one and one-half months prior to the murder and that their acquaintance centered around

drinking.  Thus, Cowfer could hardly be considered a stranger.  He also ignored the fact that Arthur [McClearn] testified at trial that he only met [Vogt] on the evening in question.

[Vogt] intimated that Arthur [McClearn] eluded him, and all of his friends and family actively working on his behalf over the past two decades.  When pressed for details on how attempts to contact Arthur [McClearn] were made, he could not provide the details.  As mentioned, [Vogt]'s mother actually located Arthur [McClearn] according to her statement and his father drove her to Arthur's house around 2005, on the heels of the 2004 Cowfer affidavit.  Yet, despite finding Arthur [McClearn], [Vogt] stated that he never asked his mother any questions about him or where he lived.  When his mother visited him in prison on July 10, 2017, he failed to inform her of this miraculous recantation letter or his latest appeal.

Given the insufficiency of the evidence presented by [Vogt] to support the authentication of the recantation letter, purportedly written by Arthur [McClearn], we conclude that the PCRA court did not abuse its discretion in declining to admit it into evidence.

Commonwealth v. Vogt, No. 1186 WDA 2021, 2023 WL 3736814, at *17-18 (Pa. Super. May 31, 2023) (footnotes omitted).

Within weeks of the Superior Court's decision, Vogt filed his current Rule 60(b) motion in this case.

### 2.  **The McClearn letter is not in the habeas record, and Vogt could not succeed on a request to expand the record to include it.**

Initially, this Court notes that McClearn's letter is not a part of the habeas record.  Vogt's attempt at getting it admitted into the record before the state court during the evidentiary hearing on his fifth PCRA petition failed because he could not properly authenticate it, and in order for Vogt to carry his burden under Schlup, he must introduce this new evidence into the record.  *See*, *e.g.*, Johnson v. Bobby, No. 2:08-CV055, 2021 WL 6125049, at *30 (S.D. Ohio Dec. 28, 2021) (Although the evidence attached to the petitioner's state court petition for post-conviction relief was arguably presented to the state court, there is a "critical distinction between state courts *being presented* with evidence and state courts *having evidence* before them . . . .").  Indeed, a

petitioner may not simply attach documents to his habeas petition, or in this case, his Rule 60(b) motion, and ask the district court to consider them.  "Rather, evidence relied upon by the petitioner that is not otherwise part of the state court record must be properly admitted into the record before the district court."  Wilcott v. Wilson, No. 1:07-cv-299, 2010 WL 582367, at *5 (W.D. Pa. Feb. 15, 2010).

Although Vogt has not made a request to expand the record or requested that this Court hold an evidentiary hearing for purposes of admitting McClearn's letter into the record, the Court assumes that by relying on the letter to support his request for relief pursuant to Rule 60(b), that is exactly what he is attempting to do.  See, e.g., Daniels v. Warden, Noble Correctional Institution, 2022 WL 6765091, at *2 (S.D. Ohio Oct. 11, 2022) (finding that petitioner was seeking to expand the record to include photographs to support a claim of actual innocence to overcome a procedural default or statute of limitations bar).

While this Court does have some discretion to expand the record or order an evidentiary hearing as provided in Rules 7 and 8 of the Rules Governing § 2254 Cases, there are some constraints worth noting.  For example, under Rule 7, which "can be used to introduce new factual information into the record in lieu of an evidentiary hearing," Boyko v. Parke, 259 F.3d 781, 790 (7th Cir. 2002), a judge may require that the additional evidence sought to be admitted be authenticated.  Additionally, AEDPA, as codified at 28 U.S.C. § 2254(e)(2), limits the ability of a federal district court to hold an evidentiary hearing pursuant to Rule 8.  See Williams v. Taylor, 529 U.S. 420, 429-45 (2000).  Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–
>
> (A)      the claim relies on–

> (i)       a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii)      a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B)     the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). "Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams, 529 U.S. at 432; *see also* Shinn v. Ramirez, 142 S. Ct. 1718, 1734-35 (2022). When § 2254(e)(2) does not prohibit a federal habeas court from holding an evidentiary hearing, it is within the district court's discretion whether to hold one under Rule 8 of the Rules Governing § 2254 Cases in the United States District Courts. *See, e.g.*, Schriro v. Landrigan, 550 U.S. 465, 473-75 (2007).[4]

Since the United States Supreme Court issued Shinn, however, this Court recognizes that precedent is unclear whether the limitations on evidentiary hearings found in § 2254(e)(2) applies to claims premised on actual innocence under Schlup. Prior to Shinn, courts, including the Third Circuit, overwhelmingly found that it did not. *See* Cristin v. Brennan, 281 F.3d 404, 417 (3d Cir. 2002) (concluding that there is no indication that Congress intended § 2254(e)(2) restrictions on evidentiary hearings to apply to "hearings on excuses to procedural defaults"); *accord* Coleman v. Hardy, 628 F.3d 314 (7th Cir. 2010) (finding that the requirements of

---

[4] In deciding whether to exercise that discretion, the federal habeas court "must consider whether such a hearing could enable the applicant to prove…factual allegations [that] would entitle [him] to federal habeas relief." Shinn, 142 S. Ct. at 1739 (quoting Landrigan, 550 U.S. at 474). "'This approach makes eminent sense,'" Shinn explained, "for if 'district courts held evidentiary hearings without first asking whether the evidence the petitioner seeks to present would satisfy AEDPA's demanding standards, they would needlessly prolong federal habeas proceedings.'" Id. (quoting Cullen v. Pinholster, 563 U.S. 170, 208-09 (2011) (Sotomayor, J., dissenting).

2254(e)(2)(A) do not have to be met in order for a court to hold an evidentiary hearing on whether the petitioner has met the actual innocence threshold necessary to consider the merits of his procedurally defaulted claim); Sibley v. Culliver, 377 F.3d 1196, 1207 n.9 (11th Cir. 2004); McSwain v. Davis, 287 F. App'x 450, 462 (6th Cir. 2008); Vineyard v. Dretke, 125 F. App'x 551, 554 (5th Cir. 2005). This is largely because courts have found that the word "claim" in § 2254(e)(2) refers only to the substantive claims for relief upon which the petition for habeas corpus is based. See Cristin, 281 F.3d at 418-19 (a hearing used to support an excuse for procedural default is not a hearing on "a claim"). Despite the fact that courts often refer to these as "claims," an actual innocence allegation is not a "claim" but instead a "gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Sibley, 377 F.3d at 1207, n.9 (quoting Herrera v. Collins, 506 U.S. 390, 404 (1993)). Shinn, however, "suggests that [t]here is good reasons to doubt' [the Court of Appeals'] reading of the word 'claim' in Cristin, [but] it [did] not abrogate [Cristin's] holding that, generally, AEDPA's text does not forbid federal courts from developing the facts needed to excuse a procedural default." Williams v. Sup't Mahanoy SCI, 45 F.4th 713, 723 (3d Cir. 2022).

Whether or not he is aware of it, Vogt's ultimate goal is to introduce McClearn's letter into the record and to have this Court evaluate his actual innocence claim in light of the information provided in the letter. However, whether or not the restrictions on evidentiary hearings found in § 2254(e)(2) apply to this new evidence appears to be a question not worth answering. This is because even if this Court was not barred from holding a hearing under § 2254(e)(2), the Court would otherwise decline to exercise its discretion to hold one given that Vogt already had an evidentiary hearing before the PCRA court, and such a hearing here would in essence amount to a waste of time and resources since it is abundantly clear that Vogt would

have the same problems authenticating McClearn's letter.  Indeed, the requirement of

authentication is a condition precedent to admitting evidence.  The Federal Rules of Evidence

recognize the requirement of authentication or identification of documentary evidence as a

condition precedent to admissibility, and provides that such requirement is satisfied by evidence

sufficient to support a finding that the matter in question is what its proponent claims.  *See* Fed.

R. E. 901(a) ("[t]o satisfy the requirement of authenticating or identifying an item of evidence,

the proponent must produce evidence sufficient to support a finding that the item is what the

proponent claims it is.").  Vogt had the opportunity to authenticate McClearn's letter in the

evidentiary hearing on his fifth PCRA petition and the state court found that he could not do so.

Although the state court applied the rule with respect to authenticating evidence under the

Pennsylvania Rules of Evidence, that rule is identical to its corresponding Federal counterpart.

*See* Pa. R. E. 901 ("Unless stipulated, to satisfy the requirement of authenticating or identifying

an item of evidence, the proponent must produce evidence sufficient to support a finding that the

item is what the proponent claims it is.")  Vogt does not point to any additional evidence that he

would present at an evidentiary hearing to authenticate McClearn's letter, and the state court's

findings regarding authentication are equally applicable here.  As such, the Court finds that the

only new evidence Vogt relies on to support his claim of innocence under Schlup is not

admissible and without it Vogt's Rule 60(b) motion must be denied.  Nevertheless, the Court will

proceed in the alternative as if Vogt has satisfied his burden under Schlup and demonstrated that

Rule 60(b) relief is warranted.

### 3.  **In the alternative, Vogt's habeas claims are without merit**.

The Court would like to reiterate what it thought it made clear in its opinion denying

Vogt's previous Rule 60(b) motion.  *See* ECF No. 91, pp. 29-30.  That is that Vogt's habeas

claims would have been denied as without merit even if they were not untimely or otherwise procedurally defaulted.[5]  Vogt raised four claims in his habeas petition.  The Court will proceed to review each of the claims *de novo*.

The first claim raised in the petition was a prosecutorial misconduct claim.  Specifically, Vogt alleged that the Commonwealth withheld <u>Brady</u>[6] material from the defense.  In <u>Brady</u>, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to the accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  To constitute a <u>Brady</u> violation, the undisclosed evidence must meet three criteria:  "'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and, prejudice must have ensued.'"  <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004) (quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999)).  In other words, a petitioner must establish both "that evidence in the possession of the government was actually suppressed, and . . . that the suppressed evidence was material."  <u>Slutzker v. Johnson</u>, 393 F.3d 373, 386 (3d Cir. 2004).  Materiality "is a 'reasonable probability' of a different result" which is "shown when the government's evidentiary suppression undermines confidence in the outcome of the trial."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995) (internal quotations omitted).

Vogt claims that the Commonwealth withheld the identity of a male individual who accompanied Cowfer into the residence of Deiseroth and Mayhugh when Cowfer confessed to

---

[5] While the Court ultimately dismissed the petition as untimely, it appears that a number of Vogt's claims, if not all of them, are also procedurally defaulted.

[6] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

Landry's murder.[7]  This claim has been addressed in different variations throughout these habeas proceedings *ad nauseam*, and most recently the Court essentially addressed it on the merits in its opinion denying Vogt's previous Rule 60(b) motion.  In pertinent part, this Court stated as follows:

> At the outset, the Court notes that since the initiation of these proceedings in 2008, Vogt has repeatedly represented to the Court that the identity of the male individual who accompanied Cowfer into the residence of Deiseroth and Mayhugh on the morning following Landry's murder is "Brady" material.  However, simply labeling something as Brady material doesn't make it so, and over the last nearly thirteen years, Vogt has never once demonstrated to this Court that this information actually constitutes Brady material.  Indeed, for the information to constitute true Brady material, Vogt would have to show that the identity of the unknown individual who accompanied Cowfer into the residence was exculpatory or impeaching, that said information was willingly or inadvertently suppressed by the Commonwealth and that had the jury known the identity of this individual then there was a reasonable probability of a different verdict.  He has not done so.
>
> First the Court notes that all that Vogt has ever produced in support of his claim that it was McClearn, and not he, who was the unidentified individual who accompanied Cowfer is a letter allegedly written and signed by Cowfer, his convicted co-defendant, whose credibility has not only been called into question by Vogt himself [FN6] but is called into question by this Court for how his story has changed over the years.  However, Cowfer's letter has never been authenticated and is signed "Walter S. Cowfer" and now "Walter S. Cowfer, Jr." as had appeared in the letters addressed to Vogt's trial counsel from 1991 and 1997.  Nevertheless, even assuming the truthfulness of such information provided by Cowfer, Vogt has never demonstrated that the Commonwealth ever knew or could have known of the identity of the unknown male individual who accompanied Cowfer into the residence, and, in fact, the evidence that was introduced at trial indicates that it is highly unlikely that they ever did know of such information as both Deiseroth and Mayhugh testified that neither of them knew the name of the individual and neither were asked while on the stand whether they could identity the individual as either Vogt, Sopo or Mcclearn.  Thus, common sense would suggest that neither the police nor the Commonwealth ever learned of the identity of this individual, at least as it could have come from Deiseroth and Mayhugh, and the only individuals who actually did know were those who were present at the residence that morning, including Cowfer, Sopo, McClearn and Vogt himself. [FN7]  However, during his

---

[7] The Court would like to note for the record that neither Deiseroth nor Mayhugh testified or inferred that the individual who was with Cowfer that morning was a male.  Instead, they referred to this individual as "some other kid" and "a friend" of Cowfer.  *See* ECF No. 72-2, pp. 5, 16.

testimony, Sopo did not admit to stopping at the residence, and, to the extent one can speculate that the Commonwealth may have learned of the identity of this individual through McClearn, counsel for Vogt could have but did not question McClearn about the stop at the residence or who went inside with Cowfer when cross-examining him at trial. [FN8]  This is most likely because such information was irrelevant, or, in other words, not "material" to Vogt's involvement in Landry's death. [FN9]  Simply put, Vogt has not shown that the identity of this individual was ever known, or should have been known, by the Commonwealth, and to the extent that Vogt would like to think of such information as "material," **even though it was not**, then the Third Circuit made clear . . . that . . . he had a duty to exercise due diligence in investigating this information . . . because since the beginning of his criminal case, or, at least since his trial, Vogt had a reasonable basis to believe that the identity of this individual was important.  Vogt clearly had at least two opportunities to investigate.  His counsel could have questioned McClearn, Deiseroth or Mayhugh about the identity of said individual at trial and Vogt himself could have questioned Cowfer about the identity of said individual at the scheduled hearing on his first PCRA petition on December 7, 1998.  He did neither . . . .  The fact is that this is not <u>Brady</u> material . . . .

> FN6    In response to why he chose to forgo calling Cowfer as a witness at the evidentiary hearing scheduled on his first PCRA petition on December 7, 1998, Vogt stated, "When I was transported to court my counsel on that action showed me a different statement he had made when he was trying to wriggle out of responsibility, which drastically conflicted with the gist of what he's sent me.  Because I realized he lacked credibility and so not to waste the time of the court I withdrew the petition."  (ECF No. 57, p.3, n.3.)

> FN7    It is not clear whether Zawodniak was waiting outside in the car or not.  McClearn testified that the group dropped her off at home before they went to Deiseroth and Mayhugh's residence, and Deiseroth testified to seeking only two people waiting in the car outside.  However, Cowfer stated in his letter dated September 23, 2004 that Zawodniak was waiting in the car with Vogt and Sopo.

> FN8    The prosecutor also did not question McClearn about who it was that went inside with Cowfer, nor did he question Deiseroth or Mayhugh about whether they recognized Vogt as being the individual who accompanied Cowfer inside that morning.

> FN9    Vogt has failed to show how the outcome of his trial would have been different had the jury actually known who it was that accompanied Cowfer into the residence of Deiseroth and Mayhugh.  Even if it was McClearn, said information is by no means exculpatory as to Vogt's involvement in Landry's death.  Whether Vogt was with Cowfer inside the residence or with the other(s) in the car, is of no importance since both

> Deiseroth and Mayhugh testified that it was *Cowfer* who incriminated himself and admitted to killing Landry.

(ECF No. 91, pp.27-29) (emphasis within).  When the Third Circuit denied Vogt a certificate of appealability from the denial of his last Rule 60(b) motion, it specifically found that "there is inarguably no merit to Vogt's <u>Brady</u> claim concerning the allegedly withheld evidence of the identity of the person who accompanied Vogt's co-defendant during a confession made to two future Commonwealth witnesses – even assuming, arguendo, that the evidence was favorable to Vogt and suppressed by the Commonwealth – because that evidence could not 'reasonably be taken to put the whole case is such a different light as to undermine confidence in the verdict.'" (ECF No. 94, p.2) (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 435 (1995)).  There is no merit to this claim and the Court declines to spend any more time addressing it.

The second and third claims raised in Vogt's petition are intimately intertwined with his first claim.  To recap, at trial, Deiseroth and Mayhugh testified that Cowfer arrived at their residence on the morning after the murder and confessed to his participation in the crime.  They further testified that "some other kid"/"friend" of Cowfer, who was never identified at trial, accompanied Cowfer into their house.  Vogt alleges that Cowfer's confession introduced through the testimony of Deiseroth and Mayhugh violated his right to confront his accusers under the Sixth Amendment (claim two) and his right to due process under the Fourteenth Amendment (claim three).[8]

With regard to claim two, Vogt states that because he was the only male co-defendant on trial with Cowfer, the implications drawn from the testimony of Deiseroth and Mayhugh was that

---

[8] Vogt's second and third claims appear to have evolved since the filing of his petition in April 2008.  Vogt initially presented these claims simply as prosecutorial misconduct claims.  *See* ECF No. 4, pp.7-8.  However, he appears to have expounded on them over the years.

it was him who was present with Cowfer that morning when Cowfer confessed and that

Cowfer's confession inculpated him.  Because Cowfer did not testify, Vogt claims that he did not

have the opportunity to test the truth of Cowfer's confession with cross-examination and

therefore its introduction was a violation of his right to confrontation under the Sixth

Amendment.

The relevant law with respect to this claim is found in Bruton v. United States, 391 U.S.

123 (1968).  The Third Circuit recently set forth the law with respect to Bruton and is progeny.

> . . . . The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant's right to be "confronted with the witnesses against him." U.S. Const. amend. VI.  This includes the ability to cross-examine witnesses.  See Pointer v. Texas, 380 U.S. 400, 404, 406-07 (1965).  When a non-testifying co-defendant's statement is introduced, it is in effect the testimony of a witness who cannot be cross-examined.  Three Supreme Court cases – Bruton; Richardson v. Marsh, 481 U.S. 200 (1987); and Gray v. Maryland, 523 U.S. 185 (1998) – establish the relevant controlling precedent.  We discuss each in turn.
>
> In Bruton, the Supreme Court held that a defendant's right to confrontation is violated when a non-testifying codefendant's confession is introduced in a joint trial, and that confession implicates the other defendant.  The Court held that even when the trial court clearly instructs the jury not to consider the statement against the non-confessing defendant, it "cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross examination."  391 U.S. at 137.  When such "powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," practically speaking, it is as though "there had been no instruction at all."  Id. at 135-36.  In this context, "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."  Id. at 135.
>
> The Supreme Court clarified Bruton's reach in Richardson, holding that no constitutional violation exists where a confession is redacted to eliminate "not only the defendant's name, but any reference to his or her existence."  481 U.S. at 211.  In those cases, a limiting instruction "may well be successful" since there is not the "overwhelming probability" that the jury will be unable to disregard the inculpatory confession against the defendant.  Id. at 208.  The Richardson Court expressed "no opinion" on whether a confession is admissible when a defendant's name is replaced with a "symbol or neutral pronoun."  Id. at 211 n.5.  The Supreme Court refined the acceptable parameters of a redacted confession in

<u>Gray</u>, holding that redactions cannot be so ineffectual that they actually could signal to the jury that the co-defendant's name was deleted.  Such obvious redactions are "similar enough to <u>Bruton</u>'s unredacted confessions as to warrant the same legal results."  523 U.S. at 195.

     While using a neutral pronoun may satisfy <u>Bruton</u> in some circumstances, we have clearly stated that courts should not apply a bright-line rule that such use will never violate <u>Bruton</u>.  <u>Bruton</u> and its progeny require courts to take a holistic approach when considering redacted confessions, by viewing the redaction in the context of the entire record.  *See* <u>Washington v. Sec'y Pa. Dep't of Corr.</u>, 801 F.3d 160, 167 (3d Cir. 2015) ("It is not enough to say that because there were redactions of [the defendants'] names that the rules from <u>Bruton</u> and <u>Gray</u> do not apply."); <u>United States v. Harwick</u>, 544 F.3d 565, 573 (3d Cir. 2008) ("[T]he nature of the linkage between the redacted statement and the other evidence in the record is vitally important in determining whether a defendant's Confrontation Clause right has been violated.").

<u>Johnson v. Superintendent Fayette SCI</u>, 949 F.3d 791, 795-96 (3d Cir. 2020).

     In this case, Cowfer's confession was introduced through the testimony of Deiseroth and

Mayhugh.  The relevant testimony from Deiseroth is as follows:

Q:    Tell us what happened at that time.

A:    He come in.  Well, he knocked on the door, him and some other kid had come in.  And he asked me if Leonard was there.  I asked him what he was doing at my house that early in the morning.  He asked if he could see Leonard.  He was kneeling down talking to Leonard down beside the couch.

Q.    Were you able to hear what the conversation was about.

A:    Yes.

Q:    And who was talking to each other at that time?

A:    Leonard Mayhugh and Sherman Cowfer.

Q:    What did you hear at that time?

A:    Well, Sherman said, I never thought I could do it.  Leonard says, what are you talking about.  I never thought I could do it.  I killed somebody.  Come on, Sherman, you didn't do nothing like that, he said.  Yes, I did.  He said, we pushed him over the quarry and blub, blub, blub, to the bottom of the quarry he went.

Q:      Did you see how Mr. Cowfer got to your apartment that day?

A:      Yes.  A little, blue car.  He was driving a little, blue car.

Q:      Do you recall whether or not there was anyone else in that car?

A:      Yes.  Two other people besides the one that come in the house with him.

Q:      All right.  What happened after that conversation?

A:      He was - - he just said - - and I didn't believe him.  I said, come on, Sherman, you know.  And he was drinking and that.  And I just started watching t.v., and him and Leonard were talking and that.  And him and the other kid got up and left.

Q:      And you had not seen him from that time until today?

A:      Yes.

(ECF No. 72-2, pp.5-7.)  The relevant testimony from Mayhugh is as follows:

Q:      What happened on May the 13th?

A:      He showed up at my house.  And him and a friend walked in.  And he came in and he kneeled down and he was talking to me.  And he says to me, he says, I don't believe I did it.  He goes, never thought I could do something like that, but I killed someone.  And I really didn't know if he was telling the truth like joking around or serious, but the more I looked at him I knew that he must have.  But after he - - after he left and that - -

Q:      Okay.  Let's go into more detail.  What else did he say after he said he killed someone?

A:      Yes.  He said he had been out partying and that he says that someone was giving him trouble or something like that.  And he told him to come over here and he was showing somebody to look over this hill.  And he said, I run and I pushed him over the hill.  And he says after that he says he went down over the hill.  He said, we did - - he said we went over the hill and they drownt this guy.  I mean, I didn't know who it was and that.  And I listened to the news and that and I heard about a guy found in the pond.  But - - and Sherman said that he drownt somebody in the quarry.

Q:      Since that day on the 13th of May, 1990, have you seen Mr. Cowfer?

A:      No, I haven't.

(ECF No. 72-2, pp.16-17.)

No objection was made to the introduction of Cowfer's confession through the testimony of Deiseroth and Mayhugh by any of the defendants' attorneys, including no objection by Vogt's defense attorney on the basis that the single reference to "we" in Deiseroth's testimony and the single reference to "they" in Mayhugh's testimony somehow violated Vogt's Sixth Amendment right to confront a witness against him.[9]  As such, no limiting instruction was requested and none was given.

Despite what Vogt proclaims, the single reference to "we" and "they" in the testimony of Deiseroth and Mayhugh could not reasonably be said to have inculpated Vogt since there was no evidence presented at trial that the other individual or individuals Cowfer was referring to when he confessed was Vogt.  Neither Deiseroth nor Mayhugh testified that the other individual who accompanied Cowfer into their residence that morning was Vogt, nor did they testify that Vogt was one of the two other individuals who were waiting outside in the car.  Furthermore, neither Deiseroth nor Mayhugh testified that it was a male who came into the house with Cowfer that morning, nor did they refer to that individual as a "he."  Therefore, it cannot be inferred that it was in fact Vogt who was with Cowfer in the house just because he was the only other male who was on trial with Cowfer.  And, even if they had referred to the other individual as a "he," the jury was very much aware that there were two other male individuals, McClearn and Sopo, who were also charged with Landry's murder, and the fact that they had chosen to plead guilty and not stand trial in no way suggests that the "he" whom Deiseroth and Mayhugh could have been

---

[9] For this reason alone, this claim would have been deemed waived had Vogt attempted to raise it on direct appeal. Furthermore, Vogt has never raised a claim of ineffective assistance of trial counsel for failing to object to said testimony as a violation of Vogt's Sixth Amendment right to confrontation.

referring to must have been Vogt.  As such, the Court does not find that there was a violation of Vogt's Sixth Amendment right to confrontation.

Nevertheless, even if the single references to "we" and "they" in Cowfer's confession as related by Desieroth and Mayhugh somehow inculpated Vogt and amounted to a violation of his right to confrontation, the issue then turns on whether that violation had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).  "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had a substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless."  O'Neal v. McAninch, 513 U.S. 432, 436 (1995) (quotation marks omitted); Bond v. Beard, 539 F.3d 256, 276 (3d Cir.2008).  This Court is not in grave doubt that the aforementioned references to "we" and "they" in Cowfer's confession had a "substantial and injurious effect or influence" on the jury's verdict.  For this additional reason this claim is without merit.

With regards to claim three, Vogt states that the Commonwealth actually knew that it was McClearn who was with Cowfer at Deiseroth and Mayhugh's residence that morning, but he claims that the Commonwealth knowingly presented false testimony in order to bolster McClearn's credibility in violation of Voght's right to due process.

The relevant law with respect to this claim is found in Napue v. People of State of Ill., 360 U.S. 264 (1959), and Giglio v. United States, 405 U.S. 150 (1972).  In both Napue and Giglio, the prosecution made agreements with witnesses in exchange for their testimony.  Both witnesses falsely denied the existence of the agreements, and the prosecutors failed to correct their testimony.  In Napue, the Supreme Court held that a conviction is obtained through the use of false evidence, and therefore violates the Fourteenth Amendment, when the state, "although

not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. at 269. In

Giglio, the government's case depended almost entirely on the testimony of a witness whom the

government promised it would not prosecute if he testified. The trial prosecutor had not himself

made the agreement and was unaware of it, but the Court charged him with knowledge of the

agreement made by his predecessor. The Court held that because the evidence was relevant to

the jury's assessment of the credibility of the witness, a new trial would be "required if 'the false

testimony could . . . in any reasonably likelihood have affected the judgment of the jury[.]'"

Giglio, 405 U.S. at 154 (quoting Napue, 360 U.S. at 271).

     Vogt's entire claim is premised on the fact that the Commonwealth knew that it was

McClearn who accompanied Cowfer into the residence of Deiseroth and Mayhugh the morning

after Landry's murder, but Vogt has never once presented any evidence that the Commonwealth

knew the identity of the individual who accompanied Cowfer. The only evidence supporting

Vogt's position that it was, in fact, McClearn has come from a letter purportedly authored by

Cowfer years after the trial. However, that letter does not impute knowledge onto the

Commonwealth, rendering Vogt's claim that the Commonwealth knowingly presented false

evidence in violation of his due process rights  without merit.

     Furthermore, the Court would like to point out that for decades now Vogt has maintained

that the identity of this individual was of vital importance to his defense, but the simple fact is

that it was not. If it were, then Vogt's trial counsel would have most certainly questioned both

Deiseroth and Mayhugh as to whether Vogt was that individual, as both likely would have been

able to identify the person they saw with Cowfer that morning if that person. Counsel did not do

so because whether Vogt went into the house or waited outside in the car was irrelevant to his

involvement in the crimes with which he charged and of which he was ultimately convicted. In

other words, the identity of this person would simply not have compelled a different outcome for Vogt.

In his fourth claim, Vogt alleges that at the time of his trial, he was unaware of the full extent of the plea agreement offered to Commonwealth witness and co-conspirator, Sopo, which Sopo entered into on January 14, 1991, approximately two weeks before Vogt's trial. Specifically, Vogt claims that he did not know that the plea agreement also covered charges Sopo was facing in a separate and unrelated case.[10]  He states that he first learned the specifics of the plea agreement on May 28, 2004, after his mother uncovered a copy of the agreement while checking the criminal records of Sopo.  Vogt maintains that the plea agreement was essential to his own defense at trial, that the Commonwealth engaged in unfair tactics by failing to disclose to the jury that Sopo's plea agreement included charges in an unrelated matter, and that his trial counsel was ineffective in failing to question Sopo about the full benefit he was receiving as part of the plea agreement.

This claim was raised by Vogt in a second PCRA petition in July 2004.  (ECF No. 14-9.) Counsel was appointed for him who filed an amended and second amended PCRA petition on Vogt's behalf.  (ECF Nos. 14-10, 14-11.)  A PCRA hearing on this issue was held on January 27, 2006, at which time Vogt's trial counsel testified that at the time of Vogt's trial he had been aware of Sopo's entire plea agreement with the Commonwealth, including his plea to charges in the separate case; however, he did not feel that the introduction of such evidence would have

---

[10] It is not entirely clear from the record, but it appears that the charges Sopo was facing in the separate case included burglary, theft and receiving stolen property.  *See* ECF No. 83-1, p.22.  It is also not clear from the record whether Sopo was sentenced in these cases before or after Vogt's trial.

benefited Vogt.  When asked why he did not question Sopo at trial regarding the specifics of

Sopo's plea agreement with the Commonwealth,[11] trial counsel testified as follows:

> A:      Well, from a trial strategy standpoint, I think as defense attorney I really
> would have been ineffective if I had opened up that area with Mr. Sopo.
> Because the very charges that he pled guilty to were the same charges that
> were charged against Steve [Vogt].  To get into that area would have in
> fact amplified his testimony as to what had occurred.  To me that would
> have made absolutely no sense.  And specifically, you will note in the
> cross-examination I did not ask about specific charges.  And that was the
> reason for it.

> Q:      Is that your full explanation on why you failed to do that?

> A:      It's my explanation at this point, yes.  If I might - - and again, you are
> talking about trial strategy.  It's been my impression as a trial attorney that
> where you get a witness such as Mr. Sopo who has made the type of deal
> that he made with the Commonwealth, that the more you open up the areas
> where he in fact has acted with your client, you in effect become almost an
> assistant District Attorney at that point.  Because you are opening up areas
> that are wide open from the standpoint of what he can say relative to your
> client.  If your question is, do I have a recollection today of having the
> specific plea agreement that you have shown to me - -

> Q:      Yes.

> A:      - - prior to that.  My answer is I don't' have a recollection of that.  But we
> knew that he had pled guilty to those charges.

> Q:      But you did not know of that specific plea agreement prior to Mr. Vogt's
> trial?

> A:      No.  That's not what I said.  We knew that he had pled guilty to burglary.
> We knew that he had pled guilty to everything that's on there including - -
> and we knew that he had the deal that he had.  And you know, very
> frankly, the deal from this standpoint based on what has - - had occurred
> may have been a good deal.  But it still was a fairly, fairly stringent
> sentence of six to 12.  He is not and was not the average person you get
> that in fact you are trying to impeach by showing that it's such a

---

[11] It is noted that at trial, Sopo was asked by both the prosecutor and Vogt's trial counsel whether he entered into a plea agreement with the Commonwealth for the charges brought against him in connection with Landry's murder, which included the condition that he testify on behalf of the Commonwealth, and he answered yes.  *See* ECF No. 72, pp.104-05, 142-43.  However, Sopo was not questioned about the specifics of what sentence he received, or the Commonwealth would recommend, as a result of that agreement.

> sweetheart deal that it's a lie.  I mean, he didn't walk away like most
> people like to do in that situation.  So, that's my explanation.

(ECF No. 83-1, pp.22-24.)

Even though Vogt's PCRA petition was ultimately dismissed as untimely (ECF No. 14-13), and that ruling was affirmed on appeal (ECF No. 14-17), the PCRA court found that trial counsel's failure to question Sopo about his prior convictions and plea agreement at Vogt's trial was a matter of reasonable trial strategy and therefore he was not ineffective in his defense of Vogt at trial (ECF No. 14-14, pp.27-28.).

To the extent this claim is raised as one of ineffective assistance of counsel, Vogt has not met his burden.  Claims of ineffectiveness of counsel are grounded in rights guaranteed under the Sixth Amendment to the United States Constitution.  In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court announced a two-prong test that a habeas petitioner must meet before a federal court can find counsel failed to provide effective assistance under the Sixth Amendment.  Under the first prong of Strickland, often called the "performance" prong, a petitioner must show that counsel's performance fell below an objective standard of reasonableness.  Id. at 688.  Under the second prong, often called the "prejudice" prong, a petitioner must demonstrate that the deficient performance prejudiced him, meaning that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Id. at 692.  Although a petitioner must satisfy both prongs to succeed on an ineffectiveness claim, the Supreme Court noted that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id. at 697.

Vogt has failed to demonstrate deficient performance on the part of his trial counsel or that he was prejudiced as a result of counsel's failure to cross-examine Sopo about the additional

unrelated charges that were covered under his plea agreement.  The record demonstrates that counsel strategically chose not to go into the details of Sopo's plea agreement with the Commonwealth and Vogt has not shown that this strategy was objectively unreasonable. However, even if Vogt could demonstrate that counsel was deficient for failing to question Sopo on those details, the record shows that the jury was already well aware that Sopo entered into an agreement with the Commonwealth in exchange for pleading guilty for his part in this case and Vogt has not shown that the result of his trial would have been any different had the jury been informed that Sopo's agreement also encompassed charges in a separate and unrelated matter. For these reasons, this claim is without merit.

Finally, to the extent Vogt intended this claim as asserting misconduct on the part of the Commonwealth for what he characterizes as a "knowing presentation of false evidence" when they elicited testimony from Sopo about his plea agreement with the Commonwealth only as this case, and not the other unrelated case, his claim is also without merit since there is absolutely nothing in the record to suggest that the Commonwealth elicited false testimony from Sopo or failed to correct testimony that they knew to be false.

### D.  Certificate of Appealability

A certificate of appealability is required to appeal from the denial of a Rule 60(b) motion. *See* Bracey v. Superintendent Rockview SCI, 986 F.3d 274, 283 (3d Cir. 2021) (reaffirming Morris v. Horn, 187 F.3d 333 (3d Cir. 1999), and holding that a certificate of appealability is required to hear an appeal from the denial of a Rule 60(b) motion).  A court should issue a certificate of appealability where a petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2254(c)(2).  The Court finds that Vogt has not made the

requisite showing in this case.  *See* <u>Slack v. McDaniel</u>, 529 U.S. 473 (2000).  A separate order follows.

Lisa Pupo Lenihan
United States Magistrate Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEVEN DAVID VOGT, | ) | |
| | ) | Civil Action No. 08 – 530 |
| Petitioner, | ) | |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| v. | ) | |
| | ) | |
| SUPERINTENDENT COLEMAN, | ) | ECF Nos. 95-98 |
| | ) | |
| Respondent. | ) | |

## ORDER

**AND NOW**, this 15th day of August, and in accordance with the Memorandum Opinion issued contemporaneously herewith,

**IT IS HEREBY ORDERED** that the Motion for Rule 60(b) Relief (ECF No. 98) is **DENIED**.

**IT IS FURTHER ORDERED** that the Motion for Discovery (ECF NO. 95), Motion for Judicial Notice of August 23, 2022 Summary Judgment at Civil Action 17-1407 (ECF No. 96) and the Motion to Appoint Counsel (ECF No. 97) are **DENIED** a moot.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **DENIED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Petitioner has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

Lisa Pupo Lenihan
United States Magistrate Judge

Cc:    Steven David Vogt

BN-3436
SCI Fayette
50 Overlook Drive
LaBelle, PA  15450

Counsel of record
(Via CM/ECF electronic mail)